WEST VIRGINIA - PITTSBURGH COAL CO., *a Corporation*

*v.*

ISABELLE STRONG, *et al.*

(CC 713 )

Submitted January 8, 1947. Decided March 18, 1947.

*Hall, Paul & Phillips,* for plaintiff.

*McCamic & Clarke* and *Rudolph E. Hagberg,* for defendant.

*Mahan, White, Higgins* and *Laird* and *Dayton R. Stemple,* amicus curiae.

KENNA, JUDGE:

This declaratory judgment proceeding was brought in the Circuit Court of Brooke County by West Virginia-Pittsburgh Coal Company against Isabelle Strong, J. C.

Strong, Lydia K. Boyd and Walter E. Mahan, Trustee, for the purpose of having adjudicated its rights under the provisions of a deed to complainant's remote grantor conveying all of the coal underlying a tract of 127.74 acres, excepting ten acres immediately surrounding a dwelling, and in addition expressly granting to the then grantee, together with the right to enter upon the land for the purpose of mining the coal and using the land in ways that would facilitate its removal, the right and obligation to purchase the surface lying above the Pittsburgh No. 8 vein which the owner of the coal might occupy or use for its operations. The defendants are the owners and lienors of the remaining freehold and the controversy arises from the denial by the owners of the complainant's alleged right to "strip mine" approximately eight acres of the Pittsburgh No. 8 vein by virtue of the mining rights granted it or to acquire that right by purchase from the owners of the surface overlying that vein, both, in addition to all the coal underlying the tract of 127.74 acres, acquired by the plaintiff remotely from the original grantee of the coal and contract rights created by the fee owner in the year 1904. The severance of the coal from the remaining freehold occurred in a deed from W. H. Boyd to Bernard W. Lewis and G. B. Findley, dated May 31, 1904, which, following the conveyance of all of the coal underlying the 127.74 acre tract, contained the following provisions:

"Together with the right to enter upon and under said land with employees, animals and machinery at convenient point and points, and to mine, dig, excavate and remove all said coal, and to remove and convey from, upon, under and through, said land all said coal and the coal from other land and lands and to make and maintain on said land all necessary and convenient structures, roads, ways, and tramways, railroads, switches, excavations, air-shafts, drains and openings, for such mining, removal and conveying of all coal aforesaid, with the exclusive use of all such rights of way and privileges aforesaid, including right to deposit mine refuse on said land and waiving all claims for injury or damage done by such mining and removal of coal aforesaid and use of such privileges.

"All of the surface of the said land occupied or used by the said parties of the second part, or their assigns, above the level of the Pittsburg # 8 vein of coal, for their operations herein shall be paid for before the same shall be so used, or occupied, at the rate of One Hundred Dollars per acre, and said party of the first part, his heirs or assigns shall execute and deliver a deed therefor, in fee simple, free from liens and incumbrances, when said surface shall be taken and paid for."

The prayer of the bill of complaint is that the court may adjudicate and declare the plaintiff's right to mine, dig, excavate and remove all the coal underlying the 127 acre tract with the exception of the named ten acres; that all of the rights of the plaintiff in and to the lands of the defendant Isabelle Strong may be adjudged and declared; that the defendant Isabelle Strong may be required to specifically perform the covenants concerning the conveyance of the surface lying above the Pittsburgh No. 8 seam in a described parcel of 22.6 acres that contains all of the coal alleged as remaining on the entire boundary for the sum of $2260.00, tendered to and refused by Isabelle Strong, and that J. C. Strong may also be required to execute a conveyance to the plaintiff therefor in order to release his inchoate right of dower; and that the defendants may be perpetually enjoined from interfering in any manner with the enjoyment by the plaintiff of its alleged rights.

The Circuit Court of Brooke County sustained a demurrer to the bill of complaint and certified to this Court the questions of law arising, the order making that court's written opinion a part of the record.

The declaratory judgment act clearly recognizes the difference between simply adjudicating "right, status and other legal relations" and the granting of relief, Code, 55-13-8, providing expressly that relief may be sought by petition following a declaratory judgment. The act further provides that a contract may be construed either before or after its breach, thus expressly recognizing that jurisdiction under the act is not re-

stricted to cases in which either a right of action or cause for equitable relief has not accrued, but that jurisdiction under the act includes as well matters in which jurisdiction could also be exercised either in chancery or at law. It can be understood why a breach of contract occurring after the institution of a proceeding under the declaratory judgment act should not divest a court of its jurisdiction to function under the act, but since the whole spirit of the act is to anticipate the actual accrual of causes for equitable relief or rights of action, by anticipatory orders which adjudicate real controversies before violation or breach results in loss to one or the other of the persons involved, it is difficult to perceive the necessity of the broad terms of Section 3. Cases that can otherwise be brought into court do not fall within the principle underlying the declaratory judgment act.

We believe that it is quite clear that the bill of complaint is demurrable to the extent that it combines a prayer for an adjudication of rights with a prayer for specific relief. Under the terms of the act the latter can be granted only to the extent that it is justified by a subsequent separate petition. Code, 55-13-8.

The bill of complaint expressly alleges that the removal of the eight acres of coal within the boundary of 22.6 acres, on account of the shallow overburden, is possible only by "excavating the surface above the said coal to expose the said coal, and then digging and removing the same", i. e. "strip mining". As we have stated, the contentions advanced by the complainant below are, first, that the mining rights expressly granted in the deed to plaintiff's remote grantor include the right to strip mine any part of the coal granted; and second, that the right to purchase the surface of the boundary of 22.6 acres confers upon the plaintiff the right to strip mine under the surface thus acquired.

In this matter the mining rights are expressly granted and do not rest upon necessary implication as in a case

where the coal is granted without the express grant of mining rights, the express terms of the grant of the rights serving to restrict the rights conferred thereto.

The prayer of plaintiff's bill is drawn in a double aspect, first, to enjoin the defendant from interfering with the mining rights to which it has succeeded, created in the Boyd to Lewis deed in 1904, and second, to require specific performance of its right to purchase the surface lying above the Pittsburgh No. 8 vein in the tract of 22.6 acres.

As to the first aspect of the prayer of the bill, from its allegations the only respect in which the defendants have refused to acknowledge what the plaintiff asserts to be its mining rights, is in refusing to permit the plaintiff to remove the surface lying above the Pittsburgh No. 8 vein or to strip mine that seam. We are of the opinion, arrived at by reading the instrument as a whole, that it was the manifest intention of the parties to preserve intact the surface of the entire tract, subject to the use of the owner of the coal "at convenient point or points" in order "to mine, dig, excavate and remove all of said coal" by the usual method at that time known and accepted as common practice in Brooke County. We do not believe that this included the practice known as strip mining.

In applying similar language in the case of *Rock House Fork Land Company* v. *Raleigh Brick and Tile Company*, 83 W. Va. 20, 24, 97 S. E. 684, this Court said:

"In this case we have no evidence as to the situation of the parties at the time of the grant, or their conduct under it, which would aid us in the interpretation of it. We have, however, language used in the deed conveying certain mining rights. The grant of these rights is to mine, excavate and remove all the coal; make and maintain all necessary railroads, excavations, ways, shafts, drains, drainways and openings necessary and convenient for the mining and removeal of said coal and other minerals. Substantial aid is afforded by this language in determining what the parties meant by the term, other minerals, in the grant. The rights granted for the

removal of these minerals are such rights as are incident to the production of minerals by means of mines, that is by shafting or tunnelling. It would seem quite clear that it was within the contemplation of the parties that the minerals granted were such as it was necessary to mine for, that is, either to tunnel for or produce by sinking shafts and tunnels therefrom. These rights granted would not be incident to their production in other ways, and so we think, as was held by the Court of Appeals of New York in the cases above referred to, that the meaning of the words used in the grant, when construed in the light of this language used in granting the mining rights, are limited to such minerals as are secured by the ordinary processes of mining. * * *"

Prior to the Acts of 1939 strip mining had not been recognized by statute in West Virginia, although now said by the Legislature to be dangerous to both life and property. Of course we had statutes imposing strict regulations upon the mining industry as a whole and creating the Department of Mines to see to their enforcement. To now contend that in 1904 the practice of strip mining was known in this State to the extent that it was necessarily within the implied contemplation of the parties to a private contract, we believe to be untenable.

Certainly if the owner of the surface has a proprietary right to subjacent support (36 Am. Jur. 405), he has at least an equal right to hold intact the thing to be supported, i. e., the surface, in the absence of a clearly expressed intention to the contrary. Of course there can be no right, proprietary or otherwise, to the preservation of something that another person has a superior right to destroy. Furthermore, we believe, in this instance, that the purpose of the landowner to retain the surface undisturbed is further borne out by the deed's requirement to the effect that the owner of the coal shall pay the landowner for the surface occupied above the Pittsburgh No. 8 vein at the rate of $100.00 per acre. That provision we believe plainly shows that it was not within the contemplation of the parties that the owner

of the coal *by virtue of the mining rights granted* should be entitled to remove any part of the surface, except for the mouths of ordinary shafts or drifts, in connection with the removal of the coal. If removal of that nature had otherwise been included in the mining rights granted, that interpretation is certainly dispelled by the provision to pay $100.00 . for the surface "occupied or used" above the Pittsburgh No. 8, since the words "occupied or used" certainly do not contemplate destruction. Furthermore, what we believe to be an option to buy the surface presupposes its existence. For these reasons we have reached the conclusion that the plaintiff, by virtue of the mining rights granted in the deed of W. H. Boyd to Lewis and Findley, was not given the right to strip mine any part of the main tract in controversy.

Before discussing the second aspect of the relief sought by complainant, we wish to call attention to the fact that according to the allegations of the bill of complaint, complainant is seeking to acquire by specific performance 22.6 acres of surface for the purpose of removing eight acres of coal from the Pittsburgh No. 8 vein described in the bill of complaint as lying within a steep hill and locatable by the showing of its "outcrop" or place where a horizontal seam may be seen to break at the surface of an elevation. The contended right to occupy and use the surface and to obtain a deed therefor applies only to that *above* the Pittsburgh No. 8 seam. We believe that it is clear that if eight acres of coal outcrop within a boundary of 22.6 acres, approximately 14.6 acres of the boundary lie beneath, and not above, the eight acre vein of coal. If that be so, then the provision does not cover the 22.6 acre tract in its entirety. That is what the bill of complaint asserts the right to buy and prays for specific performance concerning. We believe further that this conclusion is borne out by the allegations of the bill of complaint, the beginning of paragraph 8 of which reads as follows:

"Plaintiff further says that, *in the main,* said 22.6 acres surface land is steep hillside immediately above the outcrop of the Pittsburgh Number Eight Vein of coal, * * *". (Italics supplied.)

The right to specific performance does not arise if the tract of 22.6 acres lies above the Pittsburgh No. 8 seam only *in the main.* It must be entirely above that seam before it falls within the provision of the second quoted paragraph and within the prayer of the bill of complaint.

As to the second aspect of the bill's prayer, undoubtedly the mining rights granted in the Boyd deed contemplated the use of the surface by the owner of the coal for the purpose of building "convenient structures, roads, ways", et cetera. It is true that the right to use the surface of the entire tract was granted to the owner of the coal, with the exception of that lying above the Pittsburgh No. 8 seam. The right to use the surface excepting that above the Pittsburgh No. 8 seam vested upon the deed becoming effective. The right to use the surface above that seam, however, did not then vest. There was a further condition to be performed on the part of the coal owner before he would acquire the right to use the surface above the named seam, i. e., the payment of $100.00 per acre for the surface intended to be so used and occupied. It is to be noted that the payment, according to the plainly expressed provision of the deed, is made a condition precedent to the right to the use of that surface and that it is to be followed by a deed conveying the fee simple from the land owner to the owner of the coal. This provision created no contractual obligation binding the owner of the coal unconditionally. It was a right to be exercised or ignored at the election of the owner of the coal who was not bound by its terms unless he chose to occupy or use the surface above the Pittsburgh No. 8 seam. By its terms the landowner, however, was bound, so that in this particular aspect the contract was unilateral. That being so, we are of the opinion that it is to be treated as an option to buy and that the law governing such instruments constitutes

the principles that control this aspect of the plaintiff's case.

Then the question presented is whether an option of this nature, not limited in point of time, is enforceable, or whether void as being a violation of the rule against perpetuities. That rule being a rule of property and not a principle governing the law of contracts, the question of whether it. applies to the instant case largely turns upon whether an option phrased as the one here being considered is a purely personal contract or is a transfer of an interest of any sort in the land under consideration.

The leading case on that question is that of *London and South Western Railway Company v. Gomm*, 20 L. R., Chancery Division, 562, decided by the English Court of Appeal in 1882. In that case the railroad company sought to have its remote grantee, Gomm, required to specifically perform a covenant contained in the deed by which the railroad conveyed a small parcel of land; the railroad company's grantee, his heirs, executors, administrators and assigns agreeing to reconvey, time unlimited, to the railroad company upon its request and for the same consideration. The lower court held, in effect, that the optional provision of the covenant disposed of no interest in the land and consequently was not affected by the rule against perpetuities and was therefore binding. Specific performance was decreed below. This decree was reversed by the Court of Appeals, which held that the right of the railroad company to repurchase constituted an equitable interest in the property itself and consequently came within the rule against perpetuities spoken of as the doctrine of remoteness, and was therefore void.

The Pennsylvania case of *Barton v. Thaw* (1914), 246 Pa. 348, 92 Atl. 312, involved the following provision in a deed conveying all the coal and other minerals underlying a tract of land belonging to the grantor:

"And in case the said parties of the second part, their heirs or assigns, should at any future time whatsoever desire to purchase any of said land in fee simple, then the said parties of the first part, for themselves, their heirs or assigns, hereby covenant and agree to sell and convey the same to the said parties of the second part, their heirs or assigns, at a price not exceeding one hundred dollars per acre."

The Supreme Court of Pennsylvania held that the provision quoted violated the rule against perpetuities and was consequently unenforceable, citing the *Gomm* case and quoting it at length, beginning at page 360 of its opinion, holding in effect that, subject to that rule, an option to purchase constitutes an equitable burden borne by the land and binding upon subsequent owners with notice.

In the case of *Starcher Bros.* v. *Duty* (1907), 61 W. Va. 373, 56 S. E. 524, this Court held that a perpetually renewable option for the purchase of land was void as a violation of the rule against perpetuities, the fourth syllabus point reading as follows:

"Whenever a contract raises an equitable right in property which the obligee can enforce in chancery by a decree for specific performance, such equitable right is subject to the Rule against Perpetuities."

The opinion in the *Starcher Bros.* case discusses and approves that of the *Gomm* case.

The *Starcher Bros.* case was approved in *Woodall* v. *Bruen* (1915), 76 W. Va. 193, 85 S. E. 170, holding that an option to repurchase the minerals obtained in a deed from Alexander M. Bruen and wife to Woodall in 1881 was void as a violation of the rule against perpetuities. However, evidently overlooking the fact that the rule against perpetuities is a rule of property and not a principle governing the law of contracts, the third syllabus point in the *Woodall* case reads as follows:

"An option of purchase is a mere personal right, not an interest in the optioned land. "

This statement does not conform to the holdings in the *Gomm* case nor in the *Starcher Bros.* case.

We believe that the case of *Post* v. *Bailey* (1931), 110 W. Va. 504, 159 S. E. 524, involved to some extent the same distinctions that are involved here. In the *Post* case the conveyance of coal was under consideration, the deed containing a provision granting to the owner of the coal the usual mining rights together with a provision to the effect that for land used by the owner of the coal for permanent improvements the owner of the coal should pay the landowner $40.00 for each acre so used and occupied. There was no provision granting to the owner of the coal the option of buying any part of the remaining freehold. This Court held that the rule against perpetuities did not apply because the right to use the surface was a vested right not dependent upon a future contingency. The opinion in the *Post* case discusses the distinction between a covenant granting mining rights together with the right to the use of the surface to be paid for at an agreed price and the right to acquire the title to the land itself, citing with approval the Pennsylvania case of *Barton* v. *Thaw*, 246 Pa. 348, 92 At. 312, and citing 48 C. J. 947 and 21 R. C. L. 290 as stating the principle that the rule against perpetuities relates solely to the vesting of estates and is not concerned with their possession or enjoyment.

As approving *Woodall* v. *Bruen*, 76 W. Va. 193, 85 S. E. 170, with the exception of the third syllabus, as holding that an option upon the land partakes of the nature of an executory limitation and hence is not a purely personal contract, see *Skeen* v. *Clinchfield Coal Corporation*, 137 Va. 397, 404, 119 S. E. 89.

We therefore hold that the provision of the deed from W. H. Boyd to Bernard W. Lewis and G. B. Findley in terms giving the grantees the right to purchase the surface lying above the Pittsburgh No. 8 seam in the tract of 127.74 acres is unenforceable in violation of the rule against perpetuities.

The argument is advanced by the plaintiff that the ownership of the coal necessarily involves and carries the right to its removal and that if not by express grant then by necessary implication it has the right to strip mine the eight acres of the Pittsburgh No. 8 vein lying within the boundary of twenty-two acres that it has offered to purchase because of lack of overburden or roof, drift mining is not feasible. In so far as the mining rights under any circumstances or conditions grant only the right to use, or to use and occupy, the surface, the only case that we have been able to find that deals with what we regard as an inescapable conclusion, i. e., that the right to use is not the right to destroy, is the case of *Barker* v. *Mintz,* 73 Col. 262, 215 P. 534.

The first section of Chapter 85 of the Acts of the Legislature of 1945 (Michie's 1945 Supplement, Serial Section 2461 (2) ), reads as follows:

"In view of the fact that the practice of strip mining may and commonly does cause soil erosion, stream pollution and the accumulation of stagnant water, increases the likelihood of floods, destroys the value of land for agricultural purposes, counteracts efforts for the conservation of soil, water and other natural resources of the state, and in general creates hazards dangerous to life and property; now therefore, the legislature declares that its purpose in the enactment of this article is to provide such regulation and control of strip mining as to minimize its injurious effects as much as may be possible."

The same chapter declares strip mining to be unlawful unless the person engaged therein shall first obtain a permit from the chief of the Department of Mines after having paid a registration fee of $50.00 and entered into a satisfactory bond in the amount of $500.00 for each acre or fraction of an acre covered by the permit conditioned upon undertaking to restore the surface to its original condition by the performance of the duties imposed in detail by the provisions of the chapter. A similar statute was enacted by the 1939 Legislature as Chapter 84 of the Acts of that year (Michie's 1943 Code, Serial Section 2461 (2) ). It is contended by the defend-

ants below that since both of these acts are based upon a legislative finding of fact to the effect that strip mining is injurious to the public welfare, that contracts or covenants based upon its performance and otherwise valid are void as against public policy. With this contention we cannot agree, although both the Act of 1939 and that of 1945 contain declarations of fact which, we believe, would justify that holding. Certainly if the practice "in general creates hazards dangerous to life and property;" in addition to causing soil erosion, stream pollution and increasing the likelihood of floods, the courts could disapprove contracts executed for the purpose of rendering it possible had the practice, under rigid conditions, not received legislative sanction. However, since both acts, although stringently regulating the practice, allow it under the prescribed conditions and permit, it does not lie within the power of this Court to hold the legislation itself invalid as opposed to public policy. That, of course, would be the result if contracts relating to strip mining were held invalid as being contrary to public policy. But certainly enactments with the plain purpose of rigidly controlling strip mining demand of the Court a strict construction of instruments upon which that practice is based. A liberal construction would be plainly contrary to the declared legislative policy. We believe this view is further sustained by referring to Chapter 5 of the Acts of the Legislature of 1939 known as "Soil Conservation District Law of West Virginia" (Michie's Code, Article 21A, Chapter 19), which is to be read in *pari materia* with the strip mining act.

For the foregoing reasons the decree of the Circuit Court of Brooke County is affirmed.

*Affirmed.*

FOX, PRESIDENT, dissenting:

I do not concur in the holding of the majority that the order of the trial court, sustaining defendant's demurrer to plaintiff's bill, should be affirmed; but I con-

cur in certain holdings as they are expressed in the majority opinion:

(a) I agree that under Chapter 26, Acts of the Legislature, 1941, Michie's Code, 1943, Article 13, Chapter 55, the sole office of a declaratory judgment proceeding is to declare the law on facts presented. After the declaratory judgment or decree is entered, further relief may be obtained by filing a petition, in any court having jurisdiction to grant the relief sought. Section 8, Chapter 26, aforesaid. While such petition may be filed in the same court as that which entered the judgment or decree in the declaratory judgment proceeding, any other court, having jurisdiction of the dispute, may entertain the same. This, to my mind, clearly indicates that the primary declaratory judgment proceeding, and the proceedings on petition for further relief, based on the judgment or decree in the first proceeding, are separate and distinct, and cannot be joined in one proceeding. I do not believe, however, that the joining of these two grounds for relief in one suit calls for the dismissal of the bill or petition, on demurrer. At the most, the matter affecting the further relief prayed for should be eliminated, and the proceeding confined to questions bearing on the declaration of law prayed for.

(b) Then, I agree with the majority that it is difficult to understand why it is necessary to occupy and use 22.6 acres of land to remove the coal underlying approximately 8 acres above the level of the Pittsburgh No. 8 vein. It may be that, under the deed from Boyd to Lewis and Finley, dated May 31, 1904, the plaintiff is entitled only to pay for and take title to approximately 8 acres. That restriction, however, can be enforced by the decree entered on final hearing, and, in my opinion, is not ground for sustaining the demurrer to the bill. This is a matter which can and should be determined on a full hearing of the proceeding.

(c) I agree, too, that no question of public policy is here involved. Damage to land arising from strip min-

ing is so well recognized, that the Legislature, on more than one occasion, has taken cognizance thereof, and imposed regulations and restrictions on that business. That it has done so, is an implied recognition that the business, under the regulations and restrictions aforesaid, is lawful. In this situation, we should not hold it unlawful as violating public policy.

My agreement with the majority opinion goes no farther. I do not subscribe to the holding that the rule against perpetuities is here involved. The majority holding, as I understand it, is based entirely on the theory that the clause in the deed from Boyd to Lewis and Finley, which reads:

> "All of the surface of the said land occupied or used by the said parties of the second part, or their assigns, above the level of the Pittsburg # 8 vein of coal, for their operations herein shall be paid for before the same shall be so used, or occupied, at the rate of One Hundred Dollars per acre, and said party of the first part, his heirs or assigns shall execute and deliver a deed therefor, in fee simple, free from liens and incumbrances, when said surfaces shall be taken and paid for."

constitutes an option to purchase the surface of the land above the level of the Pittsburgh No. 8 vein of coal. If that holding be correct, then I agree that the cases of *London and South Western Ry. Co.* v. *Gomm*, 20 L. R. Chancery Division, 562; *Barton* v. *Thaw*, 246 Pa. 348, 92 A. 312; *Starcher Bros.* v. *Duty*, 61 W. Va. 373, 56 S. E. 524; *Woodall* v. *Bruen*, 76 W. Va. 193, 85 S. E. 170, sustain the majority position. I do not believe that *Post* v. *Bailey*, 110 W. Va. 504, 159 S. E. 524, sustains that position, although in that case the use only, and not the ownership of the surface, was involved.

In my opinion, the provision of the Boyd-Lewis deed quoted above does not contain any of the elements of an option. The deed conveyed the coal absolutely, with mining rights which permitted the grantees to enter upon and under said land and to remove *all* of said coal, without any requirement for subjacent support. But for

the clause above quoted, this gave the grantee the right to remove all the coal conveyed without restrictions, and the use of the land overlying the same. *Griffin* v. *Fairmont Coal Co.*, 59 W. Va. 480, 53 S. E. 24; *Simmers* v. *Star Coal & Coke Co.*, 113 W. Va. 309, 167 S. E. 737. The deed conveyed mining rights in general terms, but, in a paragraph immediately following the clause of the deed granting these rights, imposed a condition upon the right to occupy and use the surface of the land "above the level of the Pittsburg # 8 vein for their operations herein", by requiring the grantee to pay for grantor one hundred dollars an acre for such land so occupied and used. Then follows this language: "* * * and said party of the first part, his heirs or assigns shall execute and deliver a deed therefor, in fee simple, free from liens and incumbrances, when said surface shall be taken and paid for."

Far from being an option, the payment of $100.00 an acre amounted to an express requirement which the grantees had to meet before they could occupy and use any of the surface in removing the Pittsburgh No. 8 vein of coal, which they had purchased and paid for. It is reasonable to assume that they could not have removed said vein of coal without occupying and using at least a part of the overlying surface. Clearly, under the deed, when the grantees paid the $100.00 per acre required, they had the right to remove the Pittsburgh No. 8 vein, independent of their right to a conveyance of the surface occupied and used in such removal. This being true, there is no real connection between the right to remove the coal, by any practical method, and the right to demand a conveyance of the surface here involved. In my opinion, the bill sets up good grounds for the specific performance prayed for; but I do not believe the declaration of law to that effect is necessary to sustain the right of plaintiff to remove the Pittsburgh No. 8 vein, when it has paid the $100.00 per acre for the surface of the land it proposes to occupy and use.

I do not know what mining practices the parties to the Boyd-Lewis deed of May, 1904, had in mind. I assume that the purchase and sale, evidenced by the said deed, were the result of fair bargaining. I do not know what it was that gave rise to the required payment of $100.00 per acre; but it is fair to assume that the Pittsburgh No. 8 vein of coal is high in the hills, as it has to be to make it susceptible to strip mining, and that the mining of that coal by any other method would leave the surface of no practical value. If the usual method of mining were followed, the surface would probably subside; hence the provision that requires the grantees to pay to grantor what appears to be the full value of said surface. It may be that the parties did not, at that time, contemplate that the Pittsburgh No. 8 vein would be removed by strip mining; but they evidently contemplated that said vein of coal would be removed; and that after removal the overlying surface would be of little or no value. Therefore, to protect the owner of the surface, the provision for payment aforesaid was made a part of the deed conveying the coal.

Whatever may have been in the minds of the parties to the 1904 deed, in respect to strip mining, it is not, in my opinion, a safe rule to place obstructions in the way of the business and mechanical developments of the present age. Progress and development, along any line of endeavor, are necessary to the future of our productive and commercial life. An enterprise which stands still, is, sooner or later, due for liquidation. That modern mechanical and motor power developments have made strip mining more practical than in former years, and more practiced, cannot be said to be an unmixed evil. When practiced under the regulations prescribed by the Legislature, the evil consequences are minimized to some extent, and there is made available fuel which might not otherwise be produced. We may assume that any such operations, on the property here involved, will be conducted in accord with statutory requirements. We can safely intrust to public authorities, the duty of

enforcing the statutory requirements in respect to strip mining.

In what I have written, I do not mean to say that plaintiff should, in all events, be permitted to remove the Pittsburgh No. 8 vein of coal here involved by strip mining. If plaintiff is entitled to the conveyance of the surface aforesaid, then it would seem to be unimportant to defendant what is done with the surface, inasmuch as she will no longer own it. On the other hand, if the coal is to be removed under the general mining rights, after the $100.00 per acre payment is made, then, in my judgment, the right to the use the strip mining method should depend on facts and circumstances. I believe it is common knowledge that strip mining is more injurious to surface than other established methods of mining. There is an old rule, applied in both courts of law and courts of equity, that any granted right must be exercised in a reasonable manner, with decent regard to the interests of the person who grants that right, and so as to do as little damage as possible to persons affected thereby. I believe that rule should be applied to this case. If, as the bill alleges, the coal here involved can be removed only by strip mining, then plaintiff should, after making the payments required, be entitled to use that method; but, if said coal can be removed by the usual mining methods, at a reasonable and non-prohibitive cost, then I do not think plaintiff should be permitted to use the strip mining method. That is a factual question to be determined by the trial court, upon a full hearing of the case.

In the majority opinion, in discussing the 1904 deed, the view is expressed that "it was the manifest intention of the parties to preserve intact the surface of the entire tract", subject to the right to remove the coal by usual mining methods. In my opinion, it is perfectly clear from a study of the deed in question that it was the intent and purpose of the parties to said deed to convey the surface lying above the level of the Pittsburgh No. 8 vein; and that being true, there certainly could not

have been an intent to preserve to the grantors that part of the surface, intact or otherwise. The conclusion of the majority is that the agreement to convey the surface is not enforceable, but there can be no question but that an agreement to convey was made, and plainly expressed in the deed.

Of course, the parties to this litigation stand in the shoes of their predecessors in title. On May 31, 1904, Boyd conveyed to Lewis and Finley the coal here involved. Presumably, the parties, in agreeing upon the terms of the deed of that date, knew what they were doing. The grantees in that deed paid the grantor for the coal and mining rights and privileges conveyed, and they and their successors in title have held the same for more than forty years. The agreement, embodied in the deed, was that when, in the operations necessary to the removal of the coal conveyed, it became necessary to occupy and use the surface above the level of the Pittsburgh No. 8 vein of coal, the same should be paid for at the rate of $100.00 per acre. Plaintiff now desires to remove the coal it owns, and offers to pay the $100.00 per acre aforesaid, as required by the 1904 deed. In its bill, it alleges its right to remove said coal by strip mining. The majority opinion, in effect, denies what the 1904 deed expressly granted, namely, the right to remove *all* the coal then conveyed; for if the coal can be removed only as alleged in the bill, by the single method, strip mining, now sought to be employed, and this Court says that that particular method may not be employed, the right of plaintiff to remove its coal is absolutely destroyed. I can see neither moral nor legal justification for that inescapable result, but that aspect of the case does not appear to have been considered by those who concur in the majority opinion, or, if considered, was not deemed of sufficient importance to merit discussion. As I view the matter, the result reached on this certification denies to plaintiff a hearing on important questions which should be further developed, and which might well determine the true merits of this litigation. In my opinion,

the denial of such hearing serves unjustly to deprive plaintiff of valuable property rigths, and cannot be successfully defended under any equitable principle of which I have any knowledge. Therefore, I dissent.