J. K. Brown, *et al.*

*v.*

Crozer Coal & Land Company, *A Corporation*

(No. 10935)

Submitted January 27, 1959.    Decided March 31, 1959.

*J. W. Maxwell, D. Grove Moler, Richardson, Hudgins & Hancock,* for plaintiff in error.

*Bailey, Worrell & Bailey, C. S. Worrell,* for defendants in error.

BERRY, JUDGE:

This is an action of trespass on the case for damages alleged to have resulted because of improper mining by the Crozer Coal & Land Company, a Corporation, plaintiff in error, defendant below, hereinafter referred to as defendant, on lands claimed by J. K. Brown, Dock Brown, Cush Brown, Iva Brown, Essie Brown Bailey, Kermit Brown, Teddy Brown, Omer Brown, Ruth Brown, Rispah Brown Lush, Melvin Perry, Elmer Perry, Ernest Sparks,

Elsie Brown, Delma Brown Goad, Hugh Brown, Grat Brown, Chris Brown, Oza Brown, Ruth Brown Sharley and Virgie Brown Cook, defendants in error, plaintiffs below, hereinafter referred to as plaintiffs.

The plaintiffs are the heirs at law of Charles L. Brown and Mary Brown, both deceased, who they claim owned the property in question. The plaintiffs also claimed that the property was seriously damaged by the defendant in the process of auger mining.

In addition to a defense upon the question of whether there were damages done, the defendant introduced as a defense the right to do the damage by virtue of the mineral rights it has in the property in question and also a defense of a defective title of the plaintiffs to part of the land in question. The trial of the case in the Circuit Court of Wyoming County resulted in a verdict of $8000.00 in favor of the plaintiffs, and after the trial court overruled the defendant's motion to set aside the verdict, a writ of error and supersedeas was granted by this Court on the second application, which, in addition to applicability of the defenses, raises the question of an excessive verdict.

The land involved consisted of two tracts, one supposed to be about 101.5 acres and the other 43.4 acres, located in Wyoming County on Big Huff's Creek. The defendant made an entry on these tracts and proceeded to mine around the side of a knob and along hillsides by cutting a bench in the hillsides much in the same manner as cuts are made for strip mining. A road was constructed to get trucks in and out of the operations area, and by making the cut back into the hill, a high wall was produced which was almost vertical, reaching nearly thirty feet high in some places and being as low as ten feet in other places, the difference depending upon the slope of the hill. This produced a coal face exposure from which the coal was mined by machinery drilling a 36 inch hole into it with an auger for a distance up to 125 feet. Testimony adduced was that the road cut in the hillsides over the lands claimed by the plaintiffs varied in width, but it

had to be wide enough for the boring machine placed on it and still leave sufficient room for trucks to pass behind said machine. The usual or average width of said road for the use of the equipment and trucks referred to above was around 30 to 40 feet. The road was approximately 6,180 feet in length and was cut through almost the middle of all the property claimed by the plaintiffs. The making of the road in the manner it was made, as set out above, necessarily resulted in considerable more spoilage of the area than the width of the road, and evidence of the plaintiff indicates that it produced a spoiled area including the road between 100 and 400 feet. Dirt and debris deposited below the road slipped further down, uprooted trees and caused boulders to roll down. In addition, water diverted from normal runoff coursed down the cut and washed away dirt much further below. Some slips occurred from the upper side of the cut. The land had a timber stand on it in most places and damage to the timber was testified to, both in the destruction of trees directly and incidentally, and in making it more costly by two or three dollars a thousand to get the timber down from above the cut since it had to be snaked or skidded twice in order to get it out of the cut into which it would roll.

The plaintiffs' witnesses testified to a previous market value for the land of about $20,000.00 and a present value of about $4,000.00, constituting damages of about $16,-000.00. The witnesses who testified for the plaintiffs on the question of damages varied very little in their figures, the uniformity of which the defendant complains in its analysis of the case.

The witnesses for the defendant sought to minimize the damages, and in one instance there was testimony that the value of the land was more now than it was before the alleged damage was done. This evidence was not admitted by the trial court and the defendant assigns this action as error. There is complete disagreement on value between the witnesses for the opposing parties, some of the defendant's side placing the value of the

land in question before the alleged damage as low as $2000.00 and stating that it was the most useless mountain land in Wyoming County. The difficulty with regard to the testimony concerning the land is that no witness knew of any similar land being sold in the vicinity where this land was located for many years, and witnesses state that none was for sale there now.

The amount of area covered by the spoilage was estimated at 37.14 acres by an engineer who testified on behalf of the plaintiffs. This left over 30 acres below the cut undamaged and over 70 acres above it, although the effect of the road dividing the area into two sections was urged as damage by the plaintiffs.

With regard to the question as to title to the land and what rights each of the parties had to it, a large number of deeds, wills and case records were introduced in evidence. They need not be summarized except in a few instances, but the effect of them was to show that the titles of all parties derived from a patent in 1855 from the Commonwealth of Virginia to William Elswick. In an effort to subdivide this original 265 acre tract into two equal parts, the original owner, William Elswick, made grants to his two sons, George Washington Elswick and James Madison Elswick. An error in the description was made at that time which caused innumerable complications. The result of it and several chancery suits over a period of time was that the chain of title to the Brown tract included the 101.5 acres and the 43.4 acres adjacent, both of which apparently were intended to total 132.5 acres, and as to these two tracts, the plaintiffs claim title to the surface and the defendant claims title to the minerals. In addition, there was another chain of title involving a small acreage expressed usually as 20 acres and 8 acres, seemingly adjacent to each other, under which the Big Huff Coal Company, not a party to the present suit, claimed title to the surface of a portion of the property claimed by plaintiffs, that is, to a portion of the 43.4 acre tract. The plaintiffs claim that the 8 and 20 acre tracts were not located within the 43.4 acre

tract, but the defendant claims that both these acreages are located within the 43.4 acre tract. The defendant attempted to establish this by the testimony of an engineer, Thomas Booth, who located it within the 43.4 acres, although on cross-examination he admitted that he did not know courses or distances in which to locate the 20 and 8 acre tracts and that he merely took arbitrary matching points.

The defendant's attorney stated during the trial of this case that the defendant had paid the Big Huff Coal Company for damages to the part that Company claimed, but this matter was not raised by any pleadings so far as the record before this Court discloses.

It is undisputed that Mary and Charles Brown lived either on or near the vicinity of the 101.5 and 43.4 acre tracts from about 1893 until their respective deaths in 1932 and 1941, and that one of their sons, Chris Brown, continued to live there until the present time. During the time the Brown family of about twelve persons lived there, they farmed a considerable portion of the two tracts, but as the children grew up and left, cultivation gradually ceased until Chris Brown, the only one left, being in ill health, was unable to do more than raise some truck vegetables in the few years just prior to this suit. Witnesses for the plaintiffs testify that most of the land was fenced in from about 1907 until the fences were burned in 1935. However, defendant's witnesses deny that there had ever been a fence.

The occupation of the land by the plaintiffs or their ancestors was well enough established to warrant a jury in finding that there was adverse possession to the property in question if they had proper color of title. It is admitted in the record that the parties paid taxes on the property in question. It is clear from the record that Charles and Mary Brown lost title to the property in 1897 because of financial difficulties but they obtained good title again to the surface of the 101.5 acre tract from A. H. Cook in 1901, Cook having purchased the fee in 1897 to the 101.5 acres from C. M. Turley, trustee,

who had sold the Brown lands by foreclosure. The defendant does not appear to dispute the plaintiffs' title to the surface of the 101.5 acre tract and only raises a defense by way of estoppel to its damage to this portion of the land, claiming that Chris Brown, one of the plaintiffs, allowed the defendant to go on the land and use it in the manner it did. However, Charles and Mary Brown, plaintiffs' predecessors in title, also lost the 43.4 acre tract because of the same difficulty that involved the 101.5 acres.

Two chancery suits were also brought in the early 1900's involving Charles and Mary Brown. These chancery suits, according to the defendant, involved portions of the 43.4 acre tract by virtue of a vendor's lien foreclosure suit and a creditors' suit which were consolidated, resulting in the sale of the 8 and 20 acre tracts heretofore referred to which defendant claims were within the 43.4 acre tract. As a result of these chancery suits, the title to the 8 and 20 acre tracts was conveyed to one Isaac Brown by E. M. Worrell, Special Commissioner, in 1909, and now the Big Huff Coal Company claims title to same under Isaac Brown by *mesne* conveyances.

During the time these chancery suits were in progress, Mary Brown, a party to the suits, obtained in 1907 a deed from James A. Collins and Harman Newberry for the 43.4 acres of surface. The deed from Collins and Newberry to Mary Brown for the 43.4 acres makes it clear that they were intending to convey the surface of a portion of the original 265 acre tract which portion they claimed they held in fee by a deed dated in 1905 from A. H. Cook, who in 1904 obtained in fee the 43.4 acres as an additional tract from C. M. Turley, trustee, by conveyance of E. M. Worrell, Special Commissioner, after a suit to reform Turley's original deed covering only 101.5 acres to Cook. Turley had apparently sold to Cook in fee all the Brown lands but only conveyed 101.5 acres to Cook on his first attempt.

This conveyance by and through Turley of a total of 144.9 acres is rather difficult to understand, since Cook,

by the corrected deed, would be entitled to only one-half of the 265 acre original patent, that being 132.5, unless the original mistake in the division line by William Elswick caused the chain of title of George Elswick under which Cook had purchased to have more than one-half of the land in it. Regardless of what it should have been, Mary Brown now had a deed for 43.4 additional acres of surface which defendant claims included the 8 and 20 acre tracts. The plaintiffs claim that this has not been properly proved. This deed was obtained while the suits involving the 8 and 20 acre tracts were in progress and the defendant claims that Mary Brown was therefore a *pendente lite* purchaser and could not obtain color of title by such deed. In fact, the defendant claims her deed was fraudulent.

Therefore, the defendant holds part of its mineral rights and the plaintiffs claim their surface rights under a chain of title from A. H. Cook, but defendant also claims additional mineral rights from the Browns, arising in the following manner: In 1905 Mary and Charles Brown gave Collins and Newberry, predecessors in title of the Crozer Coal and Land Company, a quitclaim deed to the coal and other mineral rights of the 132.5 acre tract. In 1907, as previously explained, Mary and Charles Brown obtained the deed to the surface of the 43.4 acres from Collins and Newberry. The defendant insisted it had a right to act as it did in mining the coal from the tracts of land in question, at least on the grounds of estoppel against plaintiffs, because the quitclaim deed of the Browns to the defendant's predecessors in title says that they quitclaim and grant all their rights, title and interest in "all the coal and other minerals and mineral substances * * * together with the right to mine and remove said minerals in the most approved method."

The mining rights which defendant otherwise had in the 144.9 acres by deeds as a result of the severing of the minerals and surface by A. H. Cook in 1904 and by Newberry and Collins in 1907 are reservations in usual form of "all minerals together with all necessary and

useful rights for the proper mining, pumping, transporting of said minerals" in the Newberry-Collins deed to Browns and in the Cook to Collins and Newberry deed a commonly used expression of "all minerals" with "all rights-of-way, of ingress and egress over, across and through * * * [said land] for the purpose of removing the minerals &c. therefrom."

The plaintiffs take the position that the reservations and grants concerning the minerals were made at the time when strip mining and auger mining were unknown and that such deeds do not give the right to destroy the surface or subjacent support, and that there is no essential difference between auger mining and strip mining. The evidence in this case shows that auger mining was not used in Wyoming County until about 1952 and that a bond similar to one required by statute for strip mining is also required for auger mining. There is no evidence that the usual methods of mining known and accepted in Wyoming County at the time the mining rights came into existence included auger mining which results in extensive destruction of the surface.

Further defense interposed by the defendant was that Chris Brown, who was living on the property in question, told defendant's agents, when they first appeared on the property, that they could go in and work, therefore the plaintiffs are estopped to deny the right of defendant to damage the land. Chris Brown denied that he said anything more than that the defendant had a right of ingress and egress. Plaintiffs also introduced evidence to show that they made protest as the work progressed and say that, at any rate, Chris Brown's statement to defendant's agents is not binding on the other heirs.

The defendant requested the trial court to instruct the jury that it had the right to do what it did under the written instruments or deeds. These instructions were refused and the plaintiffs offered no instructions. The case was therefore submitted to the jury without instructions pertaining to the deeds or written instru-

ments. The defendant assigns this as error, stating that the court submitted both the law and facts to the jury by refusing and failing to properly instruct said jury.

The defendant also claims that it owns the timber on the land in question because of an expression in the deed from A. H. Cook to Mary Brown, reserving a right-of-way for the removal of minerals and "timber". This expression, or reservation, in the deed refers to a right-of-way and there is no reservation to the timber itself. It is true that a deed from the executors of Harman Newberry to Newberry Land Coal and Coke Company in 1916, under which defendant claims, does convey certain sized timber on the lands owned by Newberry at his death, but this by necessity refers to other lands that Newberry owned because Newberry did not reserve any timber when he conveyed with Collins the surface to the 43.4 acre tract to Mary Brown.

The defendant's predecessors in title reserved no timber rights that would inure to the benefit of the defendant in this case, and at most, all they could have had with regard to the timber, was a revocable license which would be of no avail to the defendant at the present time. See *Coal & Oil Co.* v. *Harrison,* 71 W. Va. 217, 76 S. E. 346.

The next question raised by the defendant to be considered is the defense of estoppel. In the first place, we are of the opinion that the facts do not justify the defense of estoppel in this case. The only evidence relied on by the defendant to support estoppel is that Chris Brown, one of the plaintiffs who lived on the land in question, told defendant's agents when they came on the land that they no doubt had the right to cross it. Chris Brown testified, however, that he made protest to the work being done on three different occasions and told defendant's agents that if they did not keep off the property an action would be brought against the defendant. The burden of proof is upon the party asserting estoppel and it must be made to appear affirmatively by clear, precise and unequivocal evidence. 7 Michie's Jurispru-

dence, Estoppel, §39. See *Campbell* v. *Lynch,* 88 W. Va. 209, 106 S. E. 869. We are of the opinion that since the elements necessary for the application of estoppel are not present under the facts in this case, no estoppel has been proved. 7 Michie's Jurisprudence, Estoppel, §16. Delay in the enforcement of a known right does not always give rise to the use of estoppel where no other waivers are shown and no substantial prejudice results. *Kuhn & Hoover* v. *Shreeve,* 141 W. Va. 170, 89 S. E. 2d 685.

The defendant asserts that it was error not only for the trial court to refuse instructions offered by it pertaining to the construction of the deeds in question, but also because of the fact that the plaintiffs offered no instructions and the court gave none for the defendant concerning the deeds, thereby leaving the jury uninstructed on the effect of the deeds and other instruments. The defendant's instructions dealing with this matter ignored the theory of the plaintiffs with regard to title and adverse possession of the plaintiffs. The defendant did not request or ask the court to instruct the jury on the deeds or written instruments other than in the manner submitted by the written instructions offered by it. Then too, the instructions offered by the defendant with regard to the construction of the deeds or written instruments involved in this case, which were refused by the trial court, did not properly state the law applicable to this case.

It is true that it is the duty of the trial court to instruct the jury as to law and to construe written instruments. 10 Michie's Jurisprudence, Instructions, §3. However, this duty pertains to the contents of the instructions given to the jury by the court, i.e., questions of law should not be submitted to the jury in any form. See *Britton* v. *South Penn Oil Co.,* 73 W. Va. 792, 81 S. E. 525; *Danielley* v. *Railway Co.,* 103 W. Va. 97, 136 S. E. 691. This matter is discussed in 10 Michie's Jurisprudence, Instructions, §5, wherein it is stated: "It is the right of the parties to demand instructions to the jury within

proper limits. And a court is bound to give any instruction asked for by either party, which correctly expounds the law upon any evidence before the jury, in the language of the party offering the instruction, if it correctly propounds the law applicable to the case, where there is evidence to support it and where it is not misleading, obscure or confusing." The following language concerning this question is also found in 10 Michie's Jurisprudence, Instructions, §6: "A party can only require the court to pass upon the proposition of law which he submits. He cannot, by submitting an erroneous instruction, impose upon the court the duty of giving a correct one. Therefore, if an instruction does not correctly expound the law, the court, as a general rule, may refuse to give it and is not bound to modify it or give any other instruction in its place." It is further dealt with in 10 Michie's Jurisprudence, Instructions, §9, in the following words: "The court, having to keep careful watch and guidance over all the many details of the trial as it goes on, is not bound to take each improper instruction, and so remodel it as to make it good law, nor in lieu thereof to instruct generally on the law of the case, though it might do so if asked."

Inasmuch as we have held that estoppel is not applicable to the facts in this case, instructions offered by the defendant on estoppel were properly refused by the trial court. In passing on this question, we also pass on the right of plaintiffs to recover damages done to the surface of the 101.5 acre tract of land because when the defense of estoppel is removed there is no question by the defendant as to the title of this tract being in the plaintiffs. However, defendant does question title of the plaintiffs to the 43.4 acre tract which the plaintiffs claim was damaged by the defendant in the auger mining of the coal therein. Although the conveyances, chancery suits, etc. dealing with the 43.4 acre tract tend to confusion, we are of the opinion that the plaintiffs, for the purpose of this action, did have title to this tract of land. It was not proved with any degree of certainty that the

8 and 20 acre tracts lie within the 43.4 acre tract, and without this being done the chancery suits would have no effect on the title of the plaintiffs, but even if the 20 and 8 acres did lie within the 43.4 acre tract, we are of the opinion that Mary Brown and her heirs obtained title to this tract of land by adverse possession, having color of title and possession over a period of 50 years, and having paid taxes thereon. It is true that Mary Brown purchased the 43.4 acre tract or obtained possession of it during the pendency of the chancery suits involving the 8 and 20 acre tracts, but the statute of limitation is only tolled during the litigation and the possession of a purchaser *pendente lite* may become adverse to the parties to the suit after termination of the litigation if the elements of adverse possession are otherwise present. 1 Michie's Jurisprudence, Adverse Possession, §44; 2 C.J.S., Adverse Possession, §114; *Core* v. *Faupel,* 24 W. Va. 238; *Lynch* v. *Andrews,* 25 W. Va. 751; *Jones* v. *Lemon,* 26 W. Va. 629; *Parker* v. *Clarkson,* 39 W. Va. 184, 19 S. E. 431.

*Lis Pendens* purchaser is discussed in 54 C.J.S., *Lis Pendens,* §28, as follows: "Generally speaking the rule of lis pendens continues operative during the pendency of the action or suit and until its final determination. * * *"

It was held in point 6 of the syllabus of the case of *Wade* v. *McDougle,* 59 W. Va. 113, 52 S. E. 1026 that "A verdict and judgment in ejectment by which the plaintiff recovers the contested land destroy all title in the defendant at the date of the judgment. The defendant, by adverse possession beginning after judgment, may acquire title, but possession prior to the judgment cannot be considered."

The defendant also asserts fraud in the obtaining of the deed to the 43.4 acres and that, therefore, the deed was void and adverse possession could not be raised. We think there is no merit to this contention. It is a well recognized rule that fraud is never presumed and must be proved by clear and convincing evidence. This has

·not been done in this case. See *State* v. *Davis*, 140 W. Va. 153, 83 S. E. 2d 114 and cases cited therein; *Wade* v. *McDougle*, *supra*.

The question of title to the 43.4 acre tract in this case raised by the defendant as a defense is quite confusing and difficult to understand because of reasons heretofore stated with regard to the location of the tracts involved. In connection with this, it may be well to point out that in West Virginia actual possession is *prima facie* evidence sufficient to maintain an action of trespass on the case for damage to real estate without further proof of title. 18 Michie's Jurisprudence, Trespass, §12; *Wilson* v. *Phoenix Powder Manf'g. Co.*, 40 W. Va. 413, 21 S. E. 1035; *Coal Co.* v. *County Court*, 115 W. Va. 568, 178 S. E. 621.

It is the defendant's contention in this case that it has the right under the deeds reserving or granting the minerals to operate in the manner it did on the lands in question without assuming the responsibility for damages caused to the land. It is true that one of the deeds to the minerals under which the defendant claims granted the right to remove the minerals in the most approved method and another reserved necessary and useful rights, but the language of these deeds must be interpreted and construed as of the time they were made in the county in which the land lay. See *Oresta* v. *Romano Bros. Inc.*, 137 W. Va. 633, 73 S. E. 2d 622. These deeds were executed around the turn of the century and the method used for mining the coal in this case, that of auger mining, was unused and unaccepted as common practice in Wyoming County for half a century after these deeds were executed.

The purpose of using the auger method of mining was to get the coal out and it made no difference to the defendant that this method would split the plaintiffs' land in two sections, the spoilage being over a mile in length and up to 400 feet wide in places, that the timber on the land in connection with the mining of the coal would be destroyed or diminished in value. The right of ingress

and egress and the building of roads certainly was not anticipated at the time the deeds in question were executed to any such extent as used in auger mining as indicated on the land of the plaintiffs in this case. The defendant's superintendent, having supervision of this work, testified that the operation in the building of the roadway was not done in a skillful and workmanlike manner. The roadway was not provided with drains and the operation was merely made as stated above, to obtain the coal from the land. There is no question that a considerable amount of surface was removed in obtaining the coal and the authorities cited by the defendant hold that the owners of the surface have the right to subjacent support. In the case of *Coal Company* v. *Strong*, 129 W. Va. 832, 836, 837, 42 S. E. 2d 46, this Court held: "Certainly if the owner of the surface has a proprietary right to subjacent support (36 Am. Jur. 405), he has at least an equal right to hold intact the thing to be supported, i.e., the surface, in the absence of a clearly expressed intention to the contrary." It was held in that case that the mining rights given by deed of 1904 did not include the practice known as strip mining and that case was decided in 1947. In passing on that point, this Court further said in the *Coal Company* v. *Strong* case: "We are of the opinion, arrived at by reading the instrument as a whole, that it was the manifest intention of the parties to preserve intact the surface of the entire tract, subject to the use of the owner of the coal 'at convenient point or points' in order 'to mine, dig, excavate and remove all of said coal' by the usual method at that time known and accepted as common practice in Brooke County. We do not believe that this included the practice known as strip mining." We can see little difference between strip mining in that case and auger mining in this case. Both were done in a somewhat similar manner, with quite similar results. The surface of the land was removed in both instances for the purpose of obtaining the coal. One was removed horizontally and the other vertically after a horizontal cut. Therefore, we think the principle announced by this Court in the *Coal*

*Company* v. *Strong* case is applicable to the case at bar, and we so hold. This principle was in effect reaffirmed by this Court in the case of *Oresta* v. *Romano Bros. Inc.*, *supra*. It would appear that the mining rights in the *Coal Company* v. *Strong* case were broader than the mining rights in the case at bar. There is no language in this record which indicates that the owners of the surface intended any waiver of damages to same or relinquished to the owners of the mineral rights any subjacent support. It may be well to note that the same type of bond required by statute for strip mining is required for auger mining in this state.

In the case of *Land Co.* v. *Brick & Tile Co.*, 83 W. Va. 20, 97 S. E. 684, the construction of mining rights was involved, and it was held that a deed conveying mining rights in 1885 was construed to mean the removal by shaft and tunnels used at the time of the execution of the deed and did not grant them the right to remove clay from the surface.

The defendant also assigns as error that the verdict of $8,000.00 was excessive. This assignment is based on the type of land involved and the fact that practically all of plaintiffs' witnesses testified to practically the same amount of damages. Defendant also assigns as error in connection with the damages the fact that the trial court did not allow one of the defendant's witnesses to testify that the property was worth more after the roadway was constructed and the alleged damage done than it was before such construction. This witness, Bonnie Church, stated that he did not know about the damage or value of some of the property and therefore could not testify as to all of the property involved. We are therefore of the opinion that no prejudicial error was committed by the court in refusing to allow this testimony to go to the jury. This matter is within the discretion of the trial court and will not be disturbed unless its abuse is clearly shown. *Toppins* v. *Oshel, et al.*, 141 W. Va. 152, 89 S. E. 2d 359; *Tennessee Gas Co.* v. *Fox*, 134 W. Va. 106, 58 S. E. 2d 584.

The witnesses for the plaintiffs testify that the damage done to the property caused by the improper mining operations of defendant was about $16,000.00. The jury returned a verdict for $8,000.00. It is true that some of the witnesses apparently were unfamiliar with the market value of land in the area where this land was located, since none had been sold. However, they stated that they had lived in that area for many years and were familiar with the land in question. Opinion evidence dealing with the value and damages to land is admissible if the witness has some peculiar qualification or more knowledge than jurors are ordinarily supposed to possess. *Toppins* v. *Oshel, et al., supra; Tennessee Gas Co.* v. *Fox, supra.*

In an action to recover damages, such as in the case at bar, absolute certainty as to amount of damages is not necessary and evidence as to all of the facts tending to show damages should be admitted in order to enable the jury to arrive at the most accurate estimate of damages. *Pickens* v. *Boom Company*, 58 W. Va. 11, 50 S. E. 872. The jury having heard the evidence as to damages from witnesses having peculiar qualification to testify with regard to same and having returned a verdict based on such evidence which it was within their province to do, such verdict will not be disturbed by this Court.

For the reason stated herein, the judgment of the Circuit Court of Wyoming County is affirmed.

*Affirmed.*