556 S.E.2d 95

QUINTAIN DEVELOPMENT, LLC, a Limited Liability Company Organized to do Business in the State of West Virginia, Plaintiff Below, Appellee,

v.

COLUMBIA NATURAL RESOURCES, INC., a Texas Corporation Authorized to do Business in the State of West Virginia, Defendant Below, Appellant.

No. 29163.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 5, 2001.

Decided Nov. 9, 2001.

Dissenting Opinion of Justice Maynard Dec. 5, 2001.

Mark A. Swartz, Crystal S. Stump, Swartz & Stump, L.C., Charleston, for the Appellant.

Howard M. Persinger, Jr., Williamson, S. Michael Streib, Streib & Patterson, Pittsburgh, PA, for the Appellee.

DAVIS, Justice:

This case involves the relocation of a sixteen-inch natural gas pipeline owned by Columbia Natural Resources, Inc. (hereinafter CNR), defendant below and appellant, that crossed certain tracts of land through easements obtained by CNR's predecessor in interest. The instant injunction action was filed by the appellee, Quintain Development, LLC (hereinafter "Quintain"), to compel CNR to relocate its pipeline at its own expense to enable Quintain to remove coal from the property by means of surface mining or mountain-top removal.[1] The circuit court found that the deed instruments granting CNR's easement over two of the tracts required CNR to relocate its pipeline at its own expense. The circuit court additionally found that CNR's pipeline constituted a nuisance that CNR was required to abate. We conclude that two of the deed instruments did require CNR to relocate its pipeline; however, CNR was not required to pay the cost of the relocation. Moreover, because CNR did not exceed the scope of the easements authorizing its pipelines to cross the property, the existence of the pipelines pursuant to CNR's easements could not create a nuisance. For these reasons, the order of the circuit court is affirmed in part, reversed in part, and remanded.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The following facts are not disputed by the parties. CNR's predecessor-in-interest, United Fuel Gas Company, obtained easements over the three tracts of land in question, the Vinson, Baach, and McCormick tracts, in 1914, for the placement of a V–55 sixteen inch gas pipeline. The easement over the McCormick tract was obtained by United Fuel through condemnation. Easements over the Vinson and Baach tracts were granted to United Fuel by the surface and

---

1. There were actually two CNR natural-gas pipelines traversing the property in question, a ten-inch pipeline and the sixteen-inch pipeline at issue herein. The parties reached an agreement as to the relocation of the ten-inch pipeline, thus only the question of the relocation of the sixteen-inch line was litigated.

coal owners of those tracts.[2] The easements over the Vinson and Baach tracts both contained the following reservation: "It is expressly understood and agreed that the rights and privileges hereby granted shall not interfere with the proper and reasonable use of said premises for the mining and removal of coal and other minerals therefrom or the cutting and removing of timber from said premises." In addition, the two easements contained very similar provisions related to damages. This provision in the Vinson easement stated:

> The said grantors, their heirs or assigns, to fully use and enjoy the said premises, except for the purposes hereinbefore granted to the said United Fuel Gas Company, a corporation, which hereby agrees to pay *any damages which may arise* in the future from the maintaining, operating and removing of said pipe line . . . .

(Emphasis added).[3] The condemnation easement over the McCormick tract contained no reservations or limitations.

On September 6, 1995, Quintain obtained a lease to mine coal on the surface of the Vinson tract from Frank Newsome, Jr. and Edra Newsome. Quintain also entered an agreement of sublease with Mingo Holding Company, Inc., on December 6, 1995, regarding mineral rights on the Vinson tract. This sublease granted to Quintain all of the sur-

face mining rights in the property that Mingo County Holding Company, Inc., had held by virtue of its lease with Burning Springs Collieries Company. Quintain also entered into a Lease and Sublease Agreement on December 10, 1996, with East Kentucky Energy Corporation, which granted to Quintain the surface mining rights on the Baach Tract. It is undisputed that Quintain knew of CNR's pipeline prior to acquiring these leases. Evidently, Quintain has never had rights with respect to the McCormick tract.[4]

Subsequently, Quintain advised Columbia Gas Transmission of its mining plans and requested information on what pipelines might need to be relocated to accommodate those plans. Columbia Gas Transmission referred Quintain to CNR. Thereafter, representatives of CNR informed Quintain that it would relocate the pipeline that impeded Quintain's mining activities if Quintain paid for the relocation. CNR estimated the cost of relocation to be $377,627.00.

On July 25, 1997, Quintain filed a complaint against CNR claiming that CNR was required to move its pipeline running across the Vinson and Baach tracts[5] to accommodate Quintain's planned surface mining/mountain-top removal operation. Quintain sought a declaratory judgment determining that CNR's pipeline was wrongfully interfering with Quintain's planned mining operations and also sought

---

2. There does appear to be some confusion over which tracts of land are actually involved in this dispute. While the Baach tract was addressed in the circuit court's final order, CNR asserts that prior to its relocation to an agreed position, the pipeline was not present on the Baach tract. According to CNR, the relocated pipeline now crosses some portion of the Baach tract. In addition, CNR asserts that Quintain admits that it possesses no right to surface mine the McCormick tract. According to Quintain, the circuit court clarified any confusion regarding the affected properties when it stated during the preliminary injunction hearing: "It is clear that the parties' maps place the McCormick Tract in different locations. Frankly, it doesn't make a great deal of sense to issue an injunction and require [CNR] to remove a portion of line from the Vinson Tract and not to affect the McCormick Tract. . . ." Our resolution of this dispute, however, does not require us to determine precisely which tracts of land are involved. Because the circuit court addressed all three tracts in its final order, we will likewise address all three tracts in this opinion.

3. The similar language contained in the Baach deed stated:

> The said grantors, their heirs and assigns, to fully use and enjoy the said premises, except for the purposes hereinbefore granted to the said United Fuel Gas Company, a corporation, which hereby agrees to pay *any damages which may hereafter arise* from the laying, maintaining, operating and removing said pipe line . . . .

(Emphasis added).

4. See *supra* note 2.

5. Although the complaint identifies the Vinson and Baach tracts, CNR asserts that its pipeline did not cross the Baach tract at the time of the filing of the complaint. The pipeline has now been relocated to an agreed location that does cross the Baach tract. The complaint did not include any claims with regard to the McCormick tract. That tract was apparently added to the dispute during the course of the litigation.

injunctive relief compelling CNR to move the pipeline at CNR's sole expense.

A hearing was held on August 4, 1997, pertaining to Quintain's request for a preliminary injunction. At the conclusion of the hearing, the circuit court rendered its order from the bench. The court granted the preliminary injunction and directed CNR to relocate its pipeline at its own expense. The circuit court also ordered Quintain to post a $100,000 injunction bond.[6] A written order reflecting the court's bench rulings was then entered on September 25, 1997. CNR filed an answer and counter claim seeking to have the preliminary injunction dissolved and to receive an award of the damages it incurred as a result of its compliance with the injunction.[7] Thereafter, CNR and Quintain each filed a motion for summary judgment. The circuit court subsequently indicated that it had decided the issues presented as a matter of law, and directed that a trial would be had only as to damages. The case proceeded and a bench trial was had on December 9, 1998.

Following the bench trial, the circuit court entered its final order, dated June 26, 2000, wherein it granted summary judgment in favor of Quintain. In that order, the circuit court announced its conclusions that, under the clear and unambiguous language of the easements granted with respect to the Vinson and Baach tracts, the coal estate was the dominant estate and, therefore, CNR was required to relocate its pipeline from those two tracts at its own expense. As to all three tracts, the circuit court balanced the benefits of the mining operation to the local communities of Mingo and Wayne Counties with the interests asserted by CNR and concluded that the pipeline "constitute[d] a private nuisance which CNR was required to abate at its own expense through relocation of the V–55 pipeline." It is from this order that CNR now appeals.

## II.

### STANDARD OF REVIEW

■ The instant case was resolved by the granting of summary judgment in favor

of Quintain. We have consistently stated that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). In exercising our *de novo* review, we must be mindful that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

## III.

### DISCUSSION

#### A. Relocation of CNR's Pipeline Under Vinson and Baach Deeds

The circuit court concluded that certain language contained in the two deeds granting easements over the Vinson and Baach tracts clearly established that the parties to the two deeds intended the coal estate to be the dominant estate. Based upon this conclusion, the circuit court granted the injunction directing CNR to relocate its pipeline at its own expense.

The particular language upon which the circuit court relied is identical in both deeds, and states:

It is expressly understood and agreed that the rights and privileges hereby granted shall not interfere with the proper and reasonable use of said premises for the mining and removal of coal and other minerals therefrom or the cutting and removing of timber from said premises.

■ CNR argues that the reservation in these deeds does not apply to surface or mountain top removal mining, while Quintain argues that the cases relied upon by CNR are distinguishable from the circumstances presented in the case *sub judice*. We agree with Quintain on this point.

---

6. By order entered on December 8, 1998, the bond was increased to $386,518.21.

7. According to the circuit court's final order, the evidence presented at trial demonstrated that CNR completed its relocation of the pipeline by December 1, 1997.

■ We have previously held that "[a] deed will be interpreted and construed as of the date of its execution." Syl. pt. 2, *Oresta v. Romano Bros.*, 137 W.Va. 633, 73 S.E.2d 622 (1952). Moreover, we have explained that "[i]n any construction of the language of a deed the intent of the parties is controlling." *Kell v. Appalachian Power Co.*, 170 W.Va. 14, 19, 289 S.E.2d 450, 456 (1982) (footnote omitted).

CNR relies on numerous cases applying these principles to the interpretation of deeds granting the right to mine coal. In those cases, we concluded that

> The grant of a right to surface mine may be express or implied. The right to surface mine will only be implied if it is demonstrated that, at the time the deed was executed, surface mining was *a known and accepted common practice in the locality where the land is located;* that it is reasonably necessary for the extraction of the mineral; and that it may be exercised without any substantial burden to the surface owner.

Syl., *Phillips v. Fox*, 193 W.Va. 657, 458 S.E.2d 327 (1995) (emphasis added). *Accord Brown v. Crozer Coal & Land Co.*, 144 W.Va. 296, 107 S.E.2d 777 (1959); *Oresta v. Romano Bros.*, 137 W.Va. 633, 73 S.E.2d 622 (1952); *West Virginia–Pittsburgh Coal Co. v. Strong*, 129 W.Va. 832, 42 S.E.2d 46 (1947). However, the type of cases relied upon by CNR dealt with a surface owner of land granting to another the right to interfere with the owner's enjoyment of his or her land, by virtue of mining coal. If that right were expanded to include surface mining, when that type of mining did not exist in the relevant area at the time of the execution of the deed, then the interference with the owner's ability to enjoy his or her land would have been materially different from that which the owner contemplated at the time of granting the right. Moreover, any use such a surface owner may have planned for the surface of the land, which would have been compatible with forms of mining coal that were known at the time of the execution of the deed, could very well have been rendered impossible if the general terms of such a deed were interpreted to include surface mining.

As CNR notes, however, we have also applied these principles to restrict the owner of an easement from utilizing a technology that did not exist at the time an indenture was executed. *See Kell*, 170 W.Va. 14, 289 S.E.2d 450. In *Kell*, this Court concluded that a right-of-way easement granting a power company the right to cut and remove trees did not authorize the power company to broadcast spray toxic herbicides over the right-of-way. In reaching this conclusion, the Court considered, *inter alia*, the fact that "[t]he use of aerial broadcast spraying of herbicides to control vegetation along a right-of-way was unknown in 1939 [when the indenture was executed] and could not have been within the specific contemplation of the parties to the 1939 indenture involved in this case." *Kell*, 170 W.Va. at 19, 289 S.E.2d at 456.

As with the cases involving the right to mine coal, however, the broadcast spraying addressed in *Kell* involved a use of the land that substantially changed what the owner would have been able to do with his or her land. The *Kell* landowner had granted the right to the power company to cut and remove trees to maintain its right of way. We observed in *Kell* the well established principal that "[t]he grantor-owner of the land retains the right to make any reasonable use of the land subject to the easement so long as that use is not inconsistent with the rights of the grantee." 170 W.Va. at 17, 289 S.E.2d at 453 (footnote omitted). The Court further noted that the right to make reasonable use of land subject to such an easement included, *inter alia*, "cultivation of the land, the right to pass along and across the land, the taking of minerals from the land and the construction of driveways or parking lots on the land." *Id.* at 17, 289 S.E.2d at 454 (footnote omitted). The *Kell* Court determined that the power company's application of toxic herbicides in a manner that spread the dangerous chemicals over the land, in some circumstances exceeding the boundaries of its easement, and indiscriminately killing all vegetation within and to some degree around, the easement, exceeded what was contemplated by the parties to the deed,

and substantially impacted the landowners ability to use and enjoy the land subject to the easement.

■ In the instant case, the language of the right-of-way deeds was stated in general terms, and did not expressly reserve the right to utilize surface mining or mountain-top removal mining methods. In interpreting this general language, we must construe it as of the date of its execution, and we must also attempt to give effect to the intent of the parties. It was undisputed below that surface mining and mountain top removal mining were not known in Mingo County in 1914 when the deeds in question were drafted. However, unlike *Phillips, Kell,* and other cases relied upon by CNR, the instant case involves a use of the land *reserved* by the land-owner. More importantly, and also unlike *Phillips* and *Kell,* the type of mining utilized does not materially impact upon what was within the contemplation of the parties at the time of the execution of the easements in question. The landowners clearly wished to reserve for themselves the right to remove coal from their respective properties. CNR's predecessor in interest agreed that its pipeline would not interfere with the removal of coal. Clearly the parties contemplated that if the pipeline interfered with the removal of coal, it would be relocated. This fact does not change simply because the method of mining the coal may have changed. The action which the parties contemplated, the possibility of relocating a pipeline that interfered with the mining of coal, remains the same. Consequently, we find that the circuit court was correct in concluding that, under the right-of-way deeds for the Vinson and Baach tracts, CNR was required to relocate its pipeline from those properties to the extent it interfered with the removal of coal there.

■ There is one additional question that must be resolved, however. Who should pay the cost for the relocation of the pipeline on the Vinson and Baach tracts? Quintain argues that CNR must pay the cost under the terms of the deeds. In this respect, Quintain refers to language contained in the deeds stating that United Fuel Gas Company, CNR's predecessor in interest, "hereby agrees to pay *any damages* which may arise in the future from the maintaining, operating and removing of said pipe line." [8] We are unpersuaded by Quintain's argument. This language addresses the payment of *damages* sustained from CNR's operation, maintenance, and removal of the pipeline. The language plainly does not contemplate which party should pay the cost of the relocation of the pipeline to facilitate coal mining on the property. The right-of-way deeds are silent as to who should bear the cost of such relocation. Under these circumstances, we find that Quintain should bear this cost. Quintain knew of the existence of the pipeline when it acquired its right to mine the property in question. Moreover, Quintain is the party who benefitted from the pipeline's relocation. As one court observed in a similar case:

> for the plaintiff to demand that the defendants pay for what is being done for its own benefit would be like asking the miller to pay the farmer for the flour he has produced from the farmer's wheat. The lowering of the defendants' pipeline can in no way increase the defendants' profits or facilitate the discharge of their function which is to transport oil in a pipe. The status quo was entirely satisfactory to them. They in no way sought a change in the existing conditions. It is the plaintiff who desires to alter the status quo for its benefit (even though, by deepening the bed of the defendants' pipeline it will be less subject to damage), and it should, therefore, be the plaintiff's obligation to pay for the achievement of its desire.

*Minard Run Oil Co. v. Pennzoil Co.,* 419 Pa. 334, 336, 214 A.2d 234, 235 (1965). For these reasons, we find that the circuit court erred in holding CNR responsible for the costs of the relocation of its pipes under the right-of-way deeds for the Vinson and Baach tracts.

### B. Easement as a Private Nuisance

The circuit court concluded that CNR's pipeline across the Vinson, Baach and

---

**8.** This language is taken from the Vinson deed. For similar language from the Baach deed, see *supra* note 3.

McCormick tracts constituted a private nuisance. CNR contends that, because its pipeline was laid pursuant to express easements and was a reasonable use of the land, it does not fit the definition of a private nuisance. Quintain, on the other hand, argues that the circuit court applied a balancing test and determined that the benefits to the local communities from Quintain's mining operation outweighed CNR's interests, thus CNR's refusal to relocate the pipeline at its own expense created a nuisance. To determine whether the circuit court was correct in its conclusion, we must examine the relationship between nuisances and easements.

■ **1. Relationship between Easements and Private Nuisances.** In defining a private nuisance, this Court has held that "[a] private nuisance is a substantial and unreasonable interference with the private use and enjoyment of another's land." Syl. pt. 1, *Hendricks v. Stalnaker*, 181 W.Va. 31, 380 S.E.2d 198 (1989). Further elaborating on this definition, we have explained that "[a]n interference with the private use and enjoyment of another's land is unreasonable when the gravity of the harm outweighs the social value of the activity alleged to cause the harm." Syl. pt. 2, *id.*

■ With respect to easements, this Court has previously stated that "[a]n easement may be defined as the right one person has to use the lands of another for a specific purpose...." *Kelly v. Rainelle Coal Co.*, 135 W.Va. 594, 604, 64 S.E.2d 606, 613 (1951), *overruled in part on other grounds by Kimball v. Walden*, 171 W.Va. 579, 301 S.E.2d 210 (1983). *See also* Restatement (Third) of Property § 1.2(1) (2000) ("[a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement."). Reading the definition of a nuisance set forth above in connection with this description of an easement, it may be concluded that an easement allows a person to engage in activities on another's land that, in the absence of the easement, would be a nuisance. Indeed, the Supreme Court of Iowa has recognized that "[o]ver one hundred years ago, this court held that *the right to maintain a nuisance is*

*an easement."* *Bormann v. Board of Supervisors*, 584 N.W.2d 309, 315 (Iowa 1998) (emphasis added) (citing *Churchill v. Burlington Water Co.*, 94 Iowa 89, 93, 62 N.W. 646, 647 (1895)). *Accord* Black's Law Dictionary 527 (7th ed. 1999) (defining an easement as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose .... The primary recognized easements are ... (6) *a right to do some act that would otherwise amount to a nuisance* ....") (emphasis added).

Often, however, when nuisances are discussed in connection with easements, they are described in the context of two neighboring properties, one being the dominant estate and one the servient estate, where some activity on the dominant estate may rightfully create a nuisance on the servient estate. *See Bormann*, 584 N.W.2d at 316 (holding that a statutory nuisance immunity provision "creates an easement in the property affected by the nuisance (the servient tenement) in favor of the applicants' land (the dominant tenement)[,] ... because the immunity allows the applicants *to do acts on their own land which, were it not for the easement, would constitute a nuisance*.") (emphasis added). *See also* Restatement of Property § 451, at 2912 (1944) (commenting that the owner of an affirmative easement may be entitled "to do acts on his own land which, were it not for the easement, would constitute a nuisance.").

■ In circumstances where, as here, an easement authorizes activity to be engaged in *upon* the servient property, it is generally considered that the easement authorizes a trespass. *See* Restatement of Property § 451, at 2911–12 (providing that "[a]n affirmative easement entitles the owner thereof to use the land subject to the easement by doing acts which, were it not for the easement, he would not be privileged to do," and commenting that "[i]n many cases, the use an owner of an affirmative easement is entitled to make enables him to intrude upon the land subject to the easement in ways which, were it not for the easement, would make him a trespasser upon the land."). Nevertheless, questions related to the existence of a nuisance have arisen in connection with this

type of easement where it is claimed that the owner of the easement has exceeded its scope.

In *Westchester Associates, Inc. v. Boston Edison Co.*, the owner of an office building situated on land over which Boston Edison possessed an easement authorizing the construction and use of power lines complained that magnetic fields generated by the power lines created a nuisance. 47 Mass.App.Ct. 133, 712 N.E.2d 1145 (1999). The Appeals Court of Massachusetts observed that "[a] nuisance may result from an overly intensive use or an overburdening of an easement." *Id.* at 135, 712 N.E.2d at 1148. The court then considered Edison's use of the easement and concluded that Edison had not created a nuisance. In this regard, the court stated "[Edison's] use of the easement is of the same 'amount and character' as authorized ... and we agree with the carefully crafted opinion of the Superior Court judge that Edison's use is reasonable, as [a] matter of law." *Id.* at 136–37, 712 N.E.2d at 1149. (internal citation omitted) (footnote omitted).

Similarly, in *City of Columbia v. Lentz*, the Court of Appeals of Tennessee addressed the issue of whether a city sewage drain that crossed the plaintiffs' farm and emptied into a creek running along side the farm had caused a nuisance. 39 Tenn.App. 350, 282 S.W.2d 787 (1955). The plaintiffs complained that the sewer overflowed causing raw sewage to accumulate on their land, and that the quantity of sewage released into the creek had so polluted it that their livestock would not drink the water. The city argued that its sewage drain could not cause a nuisance as the plaintiffs' predecessors in title had executed two deeds conveying easements to the city that allowed the sewer to cross the land and empty into the creek.

The Tennessee court observed that over the years following the installation of the sewage drain, the area served by the sewer had grown. In response to this growth, the city had allowed new residents and business owners to tap into the sewer line. The additional use caused such an increase in the flow of sewage that "in times of freshets or rises in the creek the sewage would back up in the pipe line, run through the top of the man-

holes, overflow parts of plaintiffs' field, and large quantities of offal and filth would be left there, in the creek, and along its banks." *City of Columbia* at 356, 282 S.W.2d at 790. The court further observed that, in an effort to relieve the pressure in the sewer line, the city "made an additional outlet for the sewer at the southern edge of plaintiffs' farm" and "constructed a backflow line running from the manhole there back to the creek, emptying sewage into the creek at the southern side of the farm." *Id.* Ultimately, the court concluded that the city had, indeed, utilized the sewer line in such a way as to create a nuisance. In reaching this conclusion, the court acknowledged the existence of the easements authorizing the sewer line, but explained that the city's use of the sewer line had exceeded the scope of those easements. In this regard, the court stated:

> there is nothing in either of these deeds giving the city the right to empty the sewage at the south or second outlet, or at any other point in the stream above the original outlet at the north side of the farm. Nor is there anything in either of the deeds which authorized the city to overflow the sewage through the manholes and upon this bottom field.

*Id.* at 358, 282 S.W.2d at 791. *See also Indiana Michigan Power Co. v. Runge*, 717 N.E.2d 216, 228–29 (Ind.Ct.App.1999) (finding that summary judgment as to nuisance claim was precluded, in part, by question of fact as to whether electrical and magnetic fields emitting from power lines traversing power company easement exceeded scope of easement); *M & D, Inc. v. McConkey*, 226 Mich.App. 801, 573 N.W.2d 281 (1997) (finding that department of transportation had acquired a prescriptive easement in a drain over the plaintiffs' property and that such drain did not constitute a nuisance as the department of transportation constructed the drain in 1972 and had not altered it since), *vacated by court order and reinstated in part by M & D, Inc. v. W.B. McConkey*, 231 Mich.App. 22, 585 N.W.2d 33 (1998).

▆ Based upon the foregoing, we hold that the actions or inactions of the owner of an easement, which otherwise meet the legal definition of a nuisance, do not create a nui-

sance as to the estate servient to the easement unless those actions or inactions exceed the scope of the easement. *Cf* Syl. pt. 1, *Hoffman v. Smith,* 172 W.Va. 698, 310 S.E.2d 216 (1983) ("Where one acquires an easement over the property of another by an express grant, the use of that easement must be confined to the terms and purposes of the grant."); Syl. pt. 2, *Lowe v. Guyan Eagle Coals, Inc.,* 166 W.Va. 265, 273 S.E.2d 91 (1980) ("No use may be made of a right-of-way different from that established at the time of its creation so as to burden the servient estate to a greater extent than was contemplated at the time of the grant.").

**2. Application of Rule to the Instant Dispute.** In this case, Quintain argues that CNR created a nuisance, not by any positive act, but by refusing to relocate its gas line and thereby preventing Quintain from mining the property in question. In order to establish that CNR's refusal constituted a nuisance, Quintain is required to establish that, under the terms of the relevant easements, CNR was obligated to move its lines and it refused to do so. We find that Quintain has failed to meet this burden.

▬ **(a) The McCormick Tract.** The language contained in the condemnation deed granting CNR's easement over the McCormick tract included no language whatsoever requiring CNR to relocate its pipelines to facilitate the mining of coal. Consequently, as a matter of law, CNR's refusal to relocate that portion of its pipeline located on the McCormick tract did not exceed the easement and, thus, does not constitute a nuisance. The circuit court erred in granting summary judgment to Quintain on this issue. Furthermore, because the nuisance theory was the sole basis for the circuit court's injunction as to the McCormick tract, the injunction is dissolved as to that tract.

▬ **(b) The Vinson and Baach Tracts.** We have determined, on the other hand, that the language of the right of way deeds over the Vinson and Baach tracts does require CNR to relocate its pipeline to facilitate mining. The record is clear, however, that from the outset CNR was willing to relocate its pipeline if Quintain would bear the cost. We have also determined in this opinion that, under the Vinson and Baach deeds, CNR was not required to bear the financial burden of relocating its pipeline from those tracts. Consequently, Quintain cannot show that CNR exceeded the scope of the Vinson or Baach easements merely by its refusal to pay for the relocation.

Because CNR's actions did not exceed the scope of its easements over the Vinson and Baach tracts, those actions do not constitute a nuisance. The circuit court erred in granting summary judgment to Quintain in this regard. While we reverse the circuit court's ruling that CNR's inaction created a nuisance on the Vinson and Baach tracts, we note that our ruling has no practical impact with respect to those tracts as we have heretofore determined, based upon the language contained in the Vinson and Baach right-of-way deeds, that the injunction should not be dissolved as it related to those tracts of land.

### C. Damages and Attorney Fees

▬ CNR argues that it is entitled to its damages and attorney fees incurred in seeking to set aside the preliminary injunction, its costs, and interest thereon. A party seeking the dissolution of a preliminary injunction is entitled to recover his or her damages and attorney fees [9] only when he or she prevails in obtaining dissolution of the injunction. The circuit court denied CNR's request that the preliminary injunction be dissolved. Accordingly, CNR's corresponding request for damages and attorney fees was also denied. Because we have reversed the circuit court's ruling as to the dissolution of the injunction with respect to the McCormick tract, CNR is entitled to recover its

---

9. Attorney fees expended in resisting the initial issuance of a preliminary injunction are not recoverable:

    In an action on an injunction bond, counsel fees and expenses expended in resisting the issuing of a preliminary writ of injunction are not damages sustained from the issuance of the

writ; and are therefore not in the condition of the bond, and cannot be taken into account in determining the amount of damages that are caused by it.

Syl. pt. 1, *State ex rel. Meadow River Lumber Co. v. Marguerite Coal Co.,* 104 W.Va. 324, 140 S.E. 49 (1927).

damages incurred in connection with the McCormick portion of the injunction. *See* W. Va.Code § 53–5–9 (1923) (Repl. Vol. 2000) ("An injunction . . . shall not take effect until bond be given in such penalty as the court or judge awarding it may direct, with condition to pay the judgment or decree (proceedings on which are enjoined) and all such costs as may be awarded against the party obtaining the injunction, *and also such damages as shall be incurred or sustained by the person enjoined, in case the injunction be dissolved* . . . .") (emphasis added). Furthermore, CNR may be entitled to recover attorney fees related to the McCormick portion of the injunction if it can establish the required elements of proof:

> When counsel fees and personal expenses are sought to be recovered as damages on an injunction bond, it is incumbent on the plaintiff to show either that injunction was the sole relief to which the suit pertained, or that the fees and expenses were paid out solely for the purpose of procuring a dissolution of the injunction, as distinguished from expenditures for the hearing of the principal issues involved in the case.

Syl. pt. 2, *State ex rel. Meadow River Lumber Co. v. Marguerite Coal Co.*, 104 W.Va. 324, 140 S.E. 49 (1927). *See also* Syl. pt. 1, *State ex rel. Shatzer v. Freeport Coal Co.*, 144 W.Va. 178, 107 S.E.2d 503 (1959) ("Reasonable attorneys fees, incurred by the party enjoined in procuring the dissolution of an injunction which was wrongfully issued, are recoverable as an element of damages in an action upon an injunction bond." (emphasis added)); Syl. pt. 2, *State ex rel. Bush v. Carden*, 111 W.Va. 631, 163 S.E. 54 (1932) ("In an action on an injunction bond, when the injunction is only ancillary to the main object of the suit, counsel fees paid for ser-

vices in the suit as a whole, are not recoverable."), *overruled in part on other grounds by State ex rel. Stout v. Rogers*, 132 W.Va. 548, 52 S.E.2d 678 (1949); Syl. pt. 2, *State ex rel. Citizens' Nat'l Bank v. Graham*, 68 W.Va. 1, 69 S.E. 301 (1910) ("In an action on an injunction bond, with condition to pay a judgment and costs, 'and also such damages as shall be incurred or sustained by the person enjoined, in case the injunction be dissolved,' reasonable counsel fees for service in the supreme court, as well as in the circuit court, may be recovered."). On remand, the trial court should consider the issue of damages and attorney fees for the dissolution of the McCormick injunction.[10]

## IV.

## CONCLUSION

For the reasons discussed in the body of this opinion, the decision of the Circuit Court of Mingo County is affirmed insofar as it found that the terms of the Vinson and Baach right-of-way deeds required CNR to relocate its pipeline as necessary to facilitate the mining of coal on that property. However, the circuit court's decision is reversed insofar as it found that CNR was required to pay the cost of relocating this portion of its pipeline. Thus, on remand, the circuit court must determine the amount of costs incurred by CNR in relocating its pipeline from the Vinson and Baach tracts. Additionally, we reverse the circuit court's finding that CNR's refusal to relocate the pipeline on the Vinson and Baach tracts constituted a nuisance.

With respect to the McCormick tract, we reverse the circuit court's ruling that CNR's refusal to relocate the pipeline constituted a nuisance. Thus, the injunction is dissolved as it relates to the McCormick tract and

---

10. We point out that, in dissolving an injunction, a trial court has discretion to require a party to bring a separate action on the bond to recover damages and attorneys fees, rather than awarding them as part of the dissolution decree. *See* Syl. pt. 2, *State ex rel. Griffith v. Purcell*, 31 W.Va. 44, 5 S.E. 301 (1888) (*"In an action on an injunction bond brought by the relator to recover damages upon the dissolution of the injunction, where none have been awarded to him by the decree dissolving the same,* the declaration must specify the particular injuries complained of oc-

casioning such damages, with such clearness and distinctness of statement, that they may be understood by the party who is to answer the same." (emphasis added)). We also note, however, that while the foregoing case remains good law, it preceded the adoption of the West Virginia Rules of Civil Procedure. Consequently, a judge exercising his or her discretion in this regard should also consider the purpose of the Rules to "secure the just, speedy, and inexpensive determination of every action." W. Va. R. Civ. P. 1.

CNR is entitled to its damages in this regard. Accordingly, this case is remanded for the entry of summary judgment in CNR's favor as to the McCormick tract.

Affirmed in part, Reversed in part, and Remanded.

Justice MAYNARD dissents and files a dissenting opinion.

MAYNARD, Justice, dissenting.

(Filed Dec. 5, 2001)

I dissent from the majority opinion because I believe the language in the easements originally obtained by United Fuel Gas Company, and now owned by CNR, should be read just as it is written. The language is not ambiguous or complicated; therefore, no interpretation is needed. Let me pause to state, however, that I realize we live in a time when prominent politicians argue about the meaning of the word "is." Therefore, I am not surprised that reasonable minds might differ regarding the definitions of "damages" and "removal."

Nonetheless, if the easements which apply to the Vinson and Baach tracts were read as they are written, I believe the majority would have reached a different result. The easements begin with an understanding between the parties that the gas company's pipelines will not interfere with the removal of coal or timber from the premises. The surface and mineral owners clearly reserved that right for themselves. The easements then state that the gas company will pay "any damages which may arise in the future from the maintaining, operating, and removing of said pipe line."

Based on this language, the circuit court ordered the gas company to "remove" and relocate the pipeline at its own expense. The majority opinion reverses the circuit court's ruling by stating that the language at issue refers only to "*damages* sustained from CNR's operation, maintenance, and removal of the pipeline." The opinion goes on to state that "removal" does not encompass "relocation;" consequently, the easements do not contemplate which party should pay relocation costs. The majority concludes that Quintain should pay because (1) Quintain was aware of the existence of the pipeline when it acquired its right to mine and (2) Quintain benefitted from the relocation.

I believe this interpretation overlooks the intent of the parties. The easements clearly state that the gas company will pay for the removal of the pipeline. Surely the term "removal" is elastic enough to include "remove and relocate." This language needs no interpretation. The pipeline was removed by CNR because it interfered with the removal of coal from the premises. Under these circumstances, the easements state that the gas company must pay.

Accordingly, I respectfully dissent.