FORDHAM, JUDGE:
Claimant seeks to recover $911,978.64 for the replacement of a culvert system located in Logan County near the mouth of Godby Branch which drains that creek under claimant’s railroad and respondent’s adjacent W.Va. Route 10. Respondent’s W.Va. Route 10 at Godby Branch is parallel to and upstream from the claimant’s railroad. This claim arises from the aftermath of a flood that occurred on June 16,2003, in which there was an apparent failure of portions of the culvert system. Claimant asserts that it had no alternative but to replace both claimant’s and respondent’s portions of the conjoined culvert structure and seeks to be reimbursed its total costs in doing so.
Claimant alleges that respondent 1) improperly constructed and attached a single box culvert to claimant’s pre-existing twin box culvert, which as a consequence, could catch debris and thus block the culvert system; 2) negligently failed to control the flow of mud and debris that blocked the inlet of the culvert system during respondent’s cleanup operations at Godby Branch; 3) failed to inspect its culvert during the clean-up efforts at Godby Branch until the condition of the culvert system was beyond the point were it could be easily remedied; and 4) was unjustly enriched when it failed to take steps to restore the flow of water through the inlet of its culvert, causing claimant to bear the expense of replacing the entire culvert system. The Court is of the opinion to make an award in this claim for the reasons more fully set forth below.
Godby Branch Culvert System
Claimant’s portion of the culvert system located at the Godby Branch watershed as it existed on June 16,2003, was constructed by claimant’s predecessor approximately one hundred years ago to allow drainage from Godby Branch to flow into the Guyandotte River beneath its railroad bed. Claimant’s predecessor railroad constructed approximately two-thirds (133' in addition to the 19.5' extension) of the culvert structure. Respondent constructed approximately one-third (85.5') of the culvert system some years thereafter. The total combined culvert system was approximately 238 feet long.
The original culvert system constructed by claimant’s predecessor was comprised of twin three foot by five foot (3' x 5') stone box culverts. The cells of the culvert system were apparently separated by a common vertical stone wall extending the length of the twin culverts and are approximately 133 feet in length. There is no credible testimony in the record as to the width of the vertical stone wall. Subsequently, claimant added a single cell concrete extension on the outfall end of the twin culverts to extend its culvert system an additional 19.5 feet.
In about 1928, as part of respondent’s construction of the Pecks Mill to Chapmanville section of W.Va. Route 10, respondent constructed a single cell culvert which it attached to the upstream inlet of the claimant’s twin culvert system, so that W.Va. Route 10 could be constructed over Godby Branch adjacent to the railway. The original plans drafted by respondent depicted a twin three foot by five foot (3' x 5’) culvert system to mirror claimant’s twin culverts. However, respondent instead constructed a five foot by six foot (5’ x 6') single cell concrete box culvert that was approximately 85.5 feet in length. This section of the culvert system was covered with fill which became the roadbed for W.Va. Route 10.
Claimant contends that respondent’s installation of a single cell culvert leading into claimant’s double cell culvert at the inlet portion of the culvert system constitutes a defective design, and respondent should have constructed a double cell culvert to match claimant’s twin cell culvert as originally designed. James Steven Gardner, a licensed *225 professional engineer and President and CEO of Engineering Consulting Services, testified for claimant that he was concerned with the original construction of respondent’s portion of the culvert system. Mr. Gardner testified as follows:
Q: And in that regard, from a design standpoint, what was the major concern with that particular design that caught your attention?
A: The fact that there is a constriction located inside of the culvert system that creates a potential trap for material.
A: ...The main concern I had was in any kind of storm event that might wash material downstream, the types that we’ve all seen in the mountains where we’ve grown up, you might imagine bridges that have brush dams that accumulate with a center pier. The same thing could happen underground with a small root wad or tree stump that might get lodged there and trapping additional material which could build up over time. A system like this I guess could function for decades without a problem and then all of a sudden something could happen, especially with a circumstance that might trigger the blockage even more.
June 16,2003, Flood at Godby Branch
On June 16, 2003, a significant flood event occurred at the Godby Branch watershed. In June 2003, Godby Branch experienced extraordinary rainfall which occurred throughout the Chapmanville area.[28] The flood event was a result of rainfall runoff and a discharge of water from an abandoned underground coal mine blowout on the hillside above Godby Branch. The excess water caused damage to County Route 10/1 and to homes in this area.[29] The area was covered with flood debris. In addition, there were slides from hills in the area. The creeks were filled and had flooded over the top of County Route 10/1. The combined flow of water from the mine and the runoff from the storm event caused a temporary pooling of water at the upstream inlet of respondent’s portion of the culvert system under W.Va. Route 10. Although flooding occurred above *226 the culvert, the culvert remained functional for a period of time following the flood.[30]
Clean-up Measures at Godby Branch
During the latter part of June 2008 and early July 2008, respondent assigned maintenance crews to remove debris from Godby Branch, replace drainage structures in and along Godby Branch, and repair County Route 10/1 that parallels Godby Branch. Respondent was engaged in clean-up activities along Godby Branch from June 19,2003, to July 23, 2003. During this period, respondent’s crews used a hydraulic excavator, known as a Gradall, to remove approximately 4,000 tons of mud and debris from Godby Branch. Terry Ellis, Crew Supervisor for respondent, testified that he scooped mud from the flowing creek and used the Gradall to break up trees and brush lodged in the stream.[31] The material was then loaded into trucks for its disposal. Troy Belcher, foreman for respondent, was directed to complete the work that Mr. Ellis had started at Godby Branch.[32] Mr. Belcher testified that respondent’s crews did not perform work at the location of the inlet end of the culvert.
On June 17, 2003, Steven Michael Runyon, District Two Bridge Design Engineer for respondent, was sent to Godby Branch to observe the damage throughout Logan County, but he also was there to check on his mother and grandmother who live on Godby Branch where he was raised. He testified that he had never seen flooding on Godby Branch until the flood that occurred in June of 2003. At that time he was inspecting the area, respondent’s crews had been performing work throughout Logan County. During his travels to Godby Branch in June and July 2003, he did not observe the inlet of the culvert until he was made aware that there was a problem.
During mid-July 2003, respondent’s crews performed pumping operations to carry water from Godby Branch across W.Va. Route 10 and into a drain that was located under the railroad tracks. At that time, essentially no water was flowing through the culvert system, and respondent was taking steps to prevent water from flooding upstream residences. Clifford Martin, Operator 3 for respondent, was the crew leader responsible for overseeing the pumping operations at the inlet of the culvert. Mr. Martin testified that he worked on the pumping operations on July 23,2003, for seventeen hours that day *227 and was involved in the pumping operations for two or three days. At the beginning of the pumping operations, respondent’s crews burned up one pump and brought in a larger pump with a six-inch line. Respondent’s crews pumped as much water out of the area as they could before ceasing the pumping operations. Mr. Martin was uncertain as to what would happen if there was a subsequent rain in the area.
Claimant alleges that respondent’s clean-up activities caused five feet of sediment to settle at the mouth of respondent’s culvert, threatening the viability of the culvert system. Claimant further alleges that respondent negligently caused and/or allowed five or more feet of mud to block the inlet of respondent’s culvert. Claimant contends that when the mud was transferred from the stream to trucks for its disposal, the silt and muddy water would run out of the trucks and back into the stream.
Claimant’s expert, James Steven Gardner, opined that respondent’s clean-up operations could have caused mud and debris to flow towards the Godby Branch culvert. Mr. Gardner stated that as much material could have been carried downstream as was actually removed during the channelization of the stream. He further testified that if 4,000 tons of material were removed, and no remedial measures were taken, then as much as 4,000 tons of material could have been carried downstream. The rain in early July 2003, he believed, could have re-suspended silt and increased the amount of sediment carried to the inlet of the culvert.
In addition, claimant contends that respondent failed to implement “best management” practices during its clean-up activities to minimize the downstream impact of sediment. Mr. Gardner testified that best management practices include rock check dams, straw bales, silt fences, or other erosion and sediment control techniques. According to Mr. Gardner, rock check dams are commonly used in construction and mining operations regardless of the size stream to serve primarily as a temporary sediment control measure to prevent sediment from moving downstream. Although Mr. Gardner stated that rock check dams can wash out in high flow areas, he stated that the flow of water at Godby Branch had receded to a normal flow. Mr. Gardner testified that he would have placed a rock check dam near the inlet of the culvert system, and then he would have placed a series of rock check dams upstream around the work areas.
Mr. Gardner further testified that inspection plays a role in best management practices:
Q: Now, I take it from that standpoint if you know that you’re going to be disturbing sediment upstream, that it would be appropriate to inspect the downstream to see whether they were in fact having an impact. Is that part of the normal best management practices?
A: Yes, especially in a situation like the culvert system that’s in place. I think it would have been appropriate to inspect not only the inlet but the outlet and try to assess exactly what the conditions were.
Respondent argues that there is insufficient evidence that the material from respondent’s work area was re-suspended in-stream and carried to the inlet of the culvert. Respondent’s expert, Douglas Kirk, civil engineer and head of respondent’s hydraulics and hydrology section, testified that re-suspension occurs when the creek re-establishes its channel and moves sediment downstream. If respondent had left the material undisturbed in the creek after the flood event, then the next time it rained, it would have washed further downstream. Thus, it was necessary for respondent to remove the material to reduce the amount of sediment available to be washed downstream to the *228 culvert. Since respondent performed its clean-up activities approximately 800 to 1,000 yards from the inlet of the culvert, Mr. Kirk stated that he did not expect a significant amount of sediment to be carried across the 800 to 1,000 yards to be deposited at the inlet end of the culvert system.
Mr. Kirk opined that best management practices such as ditch checks, straw bales, and silt fences would not have been appropriate at the Godby Branch site. Mr. Kirk explained that ditch checks are designed to slow the flow of water and prevent erosion in a ditch. If respondent had placed rocks in the stream, then the channel would no longer have been the path of least resistence, and water would have flowed over top of the banks, onto the flood plain, and onto the road, causing further erosion in those areas.
In addition, Mr. Runyon, District Two Bridge Design Engineer for respondent, testified that there is no best management practice for in-stream work. The rock ditch checks are intended to catch runoff leading into the creek and not in the creek itself. Mr. Runyon stated that rock check dams would have washed downstream, or it would have caused the elevation of the water upstream to rise, threatening the residents in the area. Also, Mr. Runyon opined that the placement of a silt fence at Godby Branch was not an option because it would have washed downstream.
According to respondent’s expert, Mr. Kirk, best management practices for in-stream work involve several techniques. The first technique involves pumping water around the work area. In this particular situation, respondent would have had to pump all the water out around the area that they were working, which he opined was impractical and impossible at that point. The second technique involves limiting the in-stream work and keeping equipment out of the stream. Since there was a road close to the creek, this method was not an issue at the Godby Branch site. The third technique, which is known as the “get in/get out” method, involves limiting the amount of time that work is being performed in the creek area in order to minimize the disturbance to the stream. Mr. Kirk testified that respondent tried to remove as much sediment as possible before additional rains washed the sediment into the culvert. Since respondent’s crews were working in an emergency situation, their main goal was to remove the sediment as quickly as possible in order to minimize the disturbance to the creek.
Inspections at the Godby Branch Culvert
Mike Smith, Bridge Supervisor for claimant in 2003, testified that inspections were performed at the Godby Branch culvert system on an annual basis. Two employees are assigned to observe the water flow and ensure that daylight can be visibly seen through the culvert. In addition, the inspectors are responsible for rating the condition of the culvert’s wing wall, head wall, and water way. The results of the inspection are then recorded on a zero through three rating system. A zero signifies that the culvert failed the inspection, and a three indicates that the culvert was in superior condition.
During the inspections of the Godby Branch culvert heldonNovember 11,1999, November 10, 2000, December 3, 2001, and September 23, 2002, the culvert received three's, indicating that the culvert was in superior condition, for all conditions on the inlet and outlet sides of the culvert. On July 8, 2003, the inlet of the culvert received the following ratings: 1) inlet wing wall - three, 2) inlet head wall - three, and 3) inlet waterway - zero. The outlet of the culvert was rated as follows: 1) outlet wing wall - three, 2) outlet head wall - three, and 3) outlet waterway - zero. The results of the inspection determined that the inlet was under water and the outlet was approximately fifty percent (50%) under water. Claimant’s personnel were *229 unable to see the waterway at the inlet and the outlet side of the culvert. Claimant’s records also demonstrate that the Guyandotte River was out of its bank during this inspection.
Collapse of the Godby Branch Culvert System
Around July 2003, before respondent had begun pumping operations, an unidentified citizen notified Mr. Runyon, District Two Bridge Design Engineer for respondent, that the culvert was no longer functioning. When Mr. Runyon went to inspect the upstream side of the culvert, he noticed that a small amount of water was coming out of the culvert. Mr. Runyon was aware that respondent’s crews used both excavators and pumps to find the inlet of the culvert, but he was also unable to observe the inlet end of the culvert system because it was covered with soupy mud. He testified that at least five feet of mud had accumulated at the inlet opening.
Curley Belcher, Logan County Administrator for respondent in 2003, also observed an apparent blockage near the outlet end of claimant’s culvert the week after the flood. He walked approximately twenty feet into the culvert and indicated that the collapse was approximately ten to twelve feet beyond that point. When Mr. Belcher inspected claimant’s double barrel culvert, he noticed that a rock had collapsed from the ceiling and from the walls in the left barrel. The rock was approximately four and a half feet high, and approximately four to eight inches of water was flowing through the left cell of claimant’s culvert. He also observed that approximately sixty-five percent (65%) to seventy percent (70%) of the right side barrel of claimant’s culvert was blocked. However, he was unable to observe the inlet of the culvert because it was covered with water and debris.
During the week of July 21, 2003, Mr. Runyon, District Two Bridge Design Engineer for respondent, observed a collapse in claimant’s end of the culvert. He noticed that the outlet end of the twin culverts had collapsed approximately twenty-five to thirty feet into the left cell of the twin culvert system, and the right cell was completed blocked. He did not go into the culvert to observe the collapse. Respondent sent a work-release prisoner into the culvert to obtain a photograph of the collapsed culvert. At that point, Mr. Runyon notified Mike Smith, Bridge Supervisor for claimant, of the culvert collapse. Mr. Runyon also contacted Roy Kaiser, claimant’s Manager of Bridges, to inform him that respondent considered the blockage of the culvert to be in claimant’s hands, and respondent was withdrawing its crews from Godby Branch.
On July 24, 2003, Mike Smith, Bridge Supervisor for claimant in 2003, was notified that there was a culvert problem at Godby Branch. He visited the outlet end of the culvert and took photographs of the inside of the culvert. Mr. Smith observed that the stone pillar of the left cell had failed approximately twenty to thirty feet in the outlet end of claimant’s culvert. Mr. Smith stated that right cell of claimant’s culvert was approximately seventy-five percent (75%) blocked, and the left cell was approximately seventy-five percent (75%) to eighty percent (80%) blocked.
Mr. Smith testified that the inlet was completely backed up with water and there was no flow coming out of the culvert. According to Mr. Smith, approximately six feet of mud was present, and the mud consisted of fine material that lacked any solidity. He drove to the upper end of Godby Branch to investigate what could have caused the mud to accumulate at the inlet end of the culvert. He noticed that there had been a lot of cleaning of the creek upstream from the flood, and the upstream activities were consistent with the material that he saw deposited downstream.
Potential Causes of the Culvert Collapse
*230 Although claimant contends that it is possible that a collapse occurred at the intersection of the two culvert systems, respondent argues that there is no direct testimony or evidence that establishes what happened to the interior of respondent’s eighty-five foot portion of the culvert system. Respondent argues that claimant did not prove that the obstruction was located in respondent’s culvert, rather than within the claimant’s portion of the culvert system. Respondent contends that the letters submitted by DMJM+Harris, Inc. (“DMJM”) during the permitting process for the replacement of the culvert system indicate that “the culvert is believed to have a center wall collapse approximately 20-25 feet from the outfall, east of Route 10 and the CSXT tracks, with the remainder of 210' feet blocked with debris.” Claimant contends that Daniel Corey, engineer for DMJM, testified that he nor anyone retained at DMJM was involved in investigating the cause of the blockage.
Despite respondent’s contention that the cause of the blockage remains unknown, claimant’s engineer, Mr. Gardner, testified to a reasonable degree of engineering certainty regarding the potential cause of the collapse. Mr. Gardner opined that sediment from respondent’s clean-up operations became trapped by flood debris in respondent’s culvert system at the junction or upstream from the junction of respondent’s single barrel and claimant’s double barrel culverts. Mr. Gardner testified that the design of the culvert increased his concern that best management practices needed to be applied at Godby Branch because the pillar situated in the middle of respondent’s culvert created a potential trap for material. Material could accumulate in the center area and build up over time, and a circumstance such as a flood event could trigger a blockage. Mr. Gardner stated as follows:
A: I think we have a set of circumstances that created a situation that led to the blockage of the culvert. First of all, heavy rains and a mine blowout that created a sudden surge of water into Godby Branch washing debris downstream.
In my opinion it’s likely that the sudden surge, which was an unusual event for Godby Branch, that debris became either lodged at the entrance of the culvert or at some point in and certainly at the intersection of the DOH culvert and the CSX double barrel culvert, and then the debris that was there wasn’t fully blocking the culvert but over time after the cleanup began and sediment continued to be transported downstream, there were some additional rains in July, I believe, that eventually that mud was trapped by the debris there much like a silt fence or a check dam inside the culvert and built up to essentially cement or plug the culvert.
Respondent avers that there is no evidence to support Mr. Gardner’s assertion that material occluded the culvert system at the junction of respondent’s and claimant’s sections. Mr. Gardner testified that he did not use, nor did he have knowledge of anyone that used, a borescope or any kind of camera inspection to determine the condition of the culvert system. Mr. Kirk, respondent’s expert engineer, testified that it was “most likely” that a blockage downstream could have caused debris and mud to fill the rest of the structure upstream. However, respondent asserts that nobody knows what happened in the 122 to 132 feet located before respondent’s section of the culvert.
Further, respondent contends that the fact that the obstruction occurred after respondent removed sediment from Godby Branch does not mean that the obstruction was the cause of the removal of the sediment. It is respondent’s position that there were independent proximate causes for the obstruction. Claimant’s expert engineer, Mr. *231 Gardner, testified that other sources of water that might have introduced debris include: 1) the flood, 2) the mine blowout, 3) slides, 4) clean-up activities of others, and 5) subsequent rains carrying sediment from roads, hill sides, slides, and yards into the stream.
Replacement of the Culvert System
Claimant contends that regardless of the cause of the culvert collapse, claimant has established that respondent had a duty to maintain the flow of water at Godby Branch, and respondent breached its duty. Thus, claimant was required to perform the necessary repairs to restore the culvert system. Claimant determined that due to the blockage at the inlet of the culvert, it had no choice but to replace the entire culvert system.
Performing repairs solely on claimant’s side of the culvert system would not have been feasible. Mike Smith, Bridge Supervisor for claimant in 2003, testified that repair of the culvert was not an option for two main reasons: First, from a safety perspective, it was too dangerous to send personnel to perform repairs of the culvert system when the inlet end was completely stopped up; Second, it would have been futile to perform repairs on the stone collapse as long as the blockage remained at the inlet side of the culvert system.
Respondent stipulates that $911,978.64 for the replacement of the 238 foot culvert system was reasonable. Claimant hired consulting engineers DMJM to design the replacement culvert system. On August 25,2003, DMJM requested an emergency permit from the US Army Corps of Engineers.[33] The Corps of Engineers issued a permit for the planned construction, and respondent issued a permit for the placement of a forty-eight inch steel pipe to relieve the flooding of Godby Branch. Claimant expended additional sums in complying with respondent’s more demanding standards. Both parties also agree that the replacement of the culvert was essential in order to prevent the flooding of upstream residences and to ensure the stability of the highway and the railway line.
The Court observes that for reasons of personal safety, no one inspected the full length of the 133 foot interior of claimant’s twin cell culvert, which appear from photographs introduced into evidence taken from the outflow end, to have collapsed just inside the outflow, filling the culvert with debris. Accordingly, there is no convincing evidence in the record to support the claimant’s burden of proof that respondent is responsible for the failure of claimant’s twin cell culvert system. Accepting, arguendo, that an obstruction was created out of mud and debris at the juncture of claimant’s twin cell culvert with respondent’s single cell system, it seems likely that the dam thus created would have merely rendered claimant’s portion of the culvert system empty (which it routinely was during periods of drought), not cause it to collapse. There was, on the other hand, testimony that the Guyandotte River itself was in flood on or about June 16,2003, *232 and that its waters rose several feet above the outflow end of claimant’s Godby Branch culvert. Could this have played a part in its collapse?
The Court also observes that, like the respondent, the claimant also had a duty to maintain the water flow at Godby Branch. That said, the Court, having considered the arguments and examined the evidence put forth by the parties in this claim, has determined that in equity and good conscience, claimant should have had more cooperation from respondent in its replacement of the culvert system. Respondent gave notice to claimant of the obstruction in the culvert system at a time when no one could observe what had happened at the inlet end of the culvert where a wall of mud and debris completely blocked the portion of the system constructed by respondent. Since there was a vertical wall separating the twin box culverts, it is reasonable to conjecture that branches, debris, and mud from the flood and the resulting actions of respondent to remove silt from Godby Branch accumulated at this wall causing a blockage at the mouth of the twin culverts. Water carried materials into the single cell culvert constructed by respondent but there may have been so much material flowing in the water such that the wall separating the claimant’s twin cell culvert actually became a dam. Would this have happened if respondent had constructed a twin system of culverts as originally designed? One can only speculate. But the fact remains that somewhere a blockage definitely occurred and claimant had no option once it was noticed of the blocked system but to construct a completely new culvert system which included replacing the portion placed by respondent. Claimant bore the expense of the new system and respondent does not dispute that claimant’s actions were reasonable under the circumstances or contend that the amount of the cost of the new system was unreasonable.
Both claimant and respondent had a responsibility to protect the residents of Godby Branch from any further flooding in the area and the only way to provide this protection was to make sure water from Godby Branch had a way to flow into the Guyandotte River. Since its railway tracks were across Godby Branch at its confluence with the Guyandotte River, and since respondent failed to act, the only solution open to the claimant was the new culvert system. However, the Court is of the opinion that claimant should not have to bear all of the expense for this new culvert. To rule otherwise would constitute the unjust enrichment of the respondent, there being no evidence that the failure of the culvert was the result of an act or acts or failure to act on the part of the claimant. See Quintain Dev., LLC v. Columbia Natural Res., Inc., 210 W.Va. 128, 556 S.E.2d 95 (W.Va. 2001); Equitable Gathering Equity, LLC v. Dynamic Energy, Inc. 2009 WL 37186 (S.D.W.Va. 2009). Thus, the Court has determined that respondent and claimant should share in this expense based upon each lineal share of the culvert system. Since respondent constructed approximately one-third of the culvert system as it existed on June 16, 2003, in its construction of W.Va. Route 10, the Court has determined that an award in this claim of one-third of the cost of the new culvert system is both fair and reasonable. Claimant incurred $911,978.64 for the new culvert system and, based upon that amount, the Court has determined that respondent should bear $303,992.88 of that cost.
Claimant filed a Motion for Summary Judgment which was heard by the Court and taken under advisement. The decision in this claim renders the Motion moot.
In accordance with the findings of fact and conclusions of law stated herein above, the Court is of the opinion to and does make an award to the claimant in the amount of $303,992.88.
Award of $303,992.88.
*233 The Honorable John G. Hackney Jr., Judge, was recused from participating in the hearing and decision of this claim.

 Curley Belcher, County Administrator for respondent, testified that he went to the Godby Branch area on June 17, 2003, the day after the flood and observed that the creeks were filled up, and there was mud in the road that was approximately twelve to eighteen inches deep in different areas.

 Claimant is currently being sued by residents and real property owners in Godby Branch whose property was damaged by flood waters allegedly caused or exacerbated by the collapse of claimant’s culvert. In a companion case, CC-05-0278, claimant seeks indemnification from respondent for any adverse judgments in those civil actions. The case deals with the events leading up to and including the June 16, 2003, event. However, that claim is not ripe for the Court’s review.

 Mike Smith, claimant’s Bridge Supervisor during the 2003 flood, testified that based on his observations immediately after the June 16, 2003, flooding, the culvert was conveying water. Steven Runyon, District II Bridge Design Engineer for respondent, testified that when he went to Godby Branch on June 17, 2003, the culvert was conveying water.

 Terry Ellis, Crew Supervisor for respondent, had been engaged in cleanup efforts on County Route 10/1 from June 19, 2003, to July 7, 2003. Respondent’s DOH 12's, or daily work reports, indicate that respondent was engaged in channeling the creek, rip-rapping the embankment, placing shot rock in the creek bank, performing shoulder work, among other related activities, during this time. Respondent’s crews also worked on cleaning up slides on W.Va. Route 10 from July 8, 2003, to July 10, 2003.

 The DOH 12's indicate that, among other activities, Mr. Belcher’s crews worked on dipping the creek out from July 14, 2003, to July 23, 2003.

 The authorization involved a two phase plan: phase 1 would allow for jacking a 48-inch diameter pipe under W.Va. Route 10 and the railway to eliminate the need for emergency pumping; phase 2 would allow for construction of a permanent drainage system to convey the required year storm. The finals plans and construction replaced the existing culvert with the forty-eight-inch pipe constructed for phase land a 96-inch pipe which conveys a twenty-five-year storm event as required by respondent.